## UNITED STATES v. COLUMBIA STEEL CO. ET AL.

No. 461.   Argued April 29–30, 1948.—Decided June 7, 1948.

496

*Solicitor General Perlman* argued the cause for the United States. With him on the brief were *Assistant Attorney General Sonnett, Charles H. Weston, Robert L. Wright, Robert G. Seaks* and *Victor H. Kramer.*

*Nathan L. Miller* argued the cause for the Columbia Steel Co. et al., appellees. With him on the brief were *Roger M. Blough, Merrill Russell* and *Edwin D. Steel, Jr.*

*Alfred Wright* argued the cause for the Consolidated Steel Corporation, appellee. With him on the brief was *Aaron Finger.*

MR. JUSTICE REED delivered the opinion of the Court.

The United States brings this suit under § 4 of the Sherman Act to enjoin United States Steel Corporation and its subsidiaries from purchasing the assets of the largest independent steel fabricator on the West Coast on the ground that such acquisition would violate §§ 1 and 2 of the Sherman Act.[1] The complaint, filed on February 24, 1947, charged that if the contract of sale between United States Steel and Consolidated Steel Corporation were carried out, competition in the sale of rolled steel

---

[1] Sections 1, 2 and 4, 15 U. S. C., read, so far as applicable, as follows:

§ 1. "Every contract, combination in the form of trust or other-wise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal: . . . Every person who shall make any contract or engage in any combination or conspiracy declared by sections 1–7 of this title to be illegal shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding $5,000, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court."

§ 2. "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding $5,000, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court."

§ 4. "The several district courts of the United States are invested with jurisdiction to prevent and restrain violations of sections 1–7 of this title; and it shall be the duty of the several district attorneys of the United States, in their respective districts, under the direction of the Attorney General, to institute proceedings in equity to prevent and restrain such violations. . . ."

products and in fabricated steel products would be re-strained, and that the contract indicated an effort on the part of United States Steel to attempt to monopolize the market in fabricated steel products. After a trial before a single judge in the district court, judgment was entered in favor of the defendants, and the government brought the case here by direct appeal. 32 Stat. 823, 15 U. S. C. § 29.

The underlying facts in the case are set forth in the findings of the trial court, and with a few exceptions those findings are not disputed by the government. We rely chiefly on the findings to indicate the nature of the commerce here in question and the extent to which competition would be affected by the challenged contract.

The steel production involved in this case may be spoken of as being divided into two stages: the production of rolled steel products and their fabrication into finished steel products. Rolled steel products consist of steel plates, shapes, sheets, bars, and other unfinished steel products and are in turn made from ingots by means of rolling mills. The steel fabrication involved herein may also be divided into structural fabrication and plate fabrication. Fabricated structural steel products consist of building framework, bridges, transmission towers, and similar permanent structures, and are made primarily from rolled steel shapes, although plates and other rolled steel products may also be employed. Fabricated plate products, on the other hand, consist of pressure vessels, tanks, welded pipe, and similar products made principally from rolled steel plates, although shapes and bars are also occasionally used. Both plate and structural fabricated products are made to specifications for a particular purpose; fabricated products do not include standard products made by repetitive processes in the manufacture of general steel merchandise such as wire, nails, bolts, and

window frames. The manufacture of such standardized finished products is not involved in this case. The facilities required for structural fabrication are quite different from those required for plate fabrication; the former require equipment for shearing, punching, drilling, assembling, and riveting or welding structural shapes whereas the latter require equipment for bending, rolling, cutting, and forming the plates which go into the finished product.

The complaint lists four defendants: Columbia Steel Company, Consolidated Steel Corporation, United States Steel Corporation, and United States Steel Corporation of Delaware. United States Steel and its subsidiaries engage in the business of producing rolled steel products and in structural fabrication, but do no plate fabrication work. Consolidated Steel, the sale of whose assets the government seeks to enjoin, is engaged only in structural fabrication and plate fabrication. United States Steel with its subsidiaries is the largest producer of rolled steel products in the United States, with a total investment of more than a billion and a half dollars. During the ten-year period 1937–1946 United States Steel produced almost exactly a third of all rolled steel products produced in the United States, and average sales for that period were nearly a billion and a half dollars. In the five-year period 1937–1941, average sales were a little over a billion dollars. Consolidated, by contrast, had plants whose depreciated value was less than ten million dollars. During the five-year period 1937–1941, Consolidated had average sales of only twenty million dollars, and the United States Steel committee which negotiated the terms of the purchase of Consolidated estimated that Consolidated's sales in the future would run to twenty-two million dollars annually and agreed with Consolidated on a purchase price of slightly in excess of eight million dollars. During the war Consolidated produced over a

billion and a half dollars worth of ships with government-furnished facilities. Consolidated no longer possesses any facilities for building ships.[2]

Columbia Steel, a wholly-owned subsidiary of United States Steel, has been the largest rolled steel producer in the Pacific Coast area since 1930, with plants in Utah and California, and has also served as selling agent for other rolled steel subsidiaries of United States Steel, and for two subsidiaries of that company engaged in structural fabrication, the American Bridge Company at Pittsburgh and the Virginia Bridge Company at Roanoke, Virginia, though neither it nor any other subsidiary of United States Steel in the Consolidated market area was a fabricator of any kind. National Tube Company, another United States Steel subsidiary, sells pipe and tubing. Consolidated has structural fabricating plants near Los Angeles and at Orange, Texas, and plate fabricating facilities in California and Arizona. Consolidated has sold its products during the past ten years in eleven states, referred to hereafter as the Consolidated market: Arizona, California, Idaho, Louisiana, Montana, Nevada, New Mexico, Oregon, Texas, Utah and Washington. It is that market which the government views as significant in determining the extent of competition between United States Steel and Consolidated. It is not the usual Pacific

---

[2] An uncontested statement of Consolidated's ship building activities during the war years appears in Consolidated's brief:

"During the war years, acting under Government sponsorship, Consolidated constructed ships for defense and war purposes for various Government procurement agencies but it is no longer engaged in this field. Consolidated's war work was confined to ship and ordnance construction with Government furnished facilities, all of which have now been abandoned. Consolidated Shipyards, Inc., a Consolidated subsidiary operating a small boat yard, has disposed of its plant to a group of real estate speculators. There is, therefore, no competition between U. S. Steel and Consolidated in the shipbuilding business."

and Mountain states groups employed by the Census.[3] United States Steel Corporation of Delaware is a subsidiary of United States Steel which renders technical assistance to other subsidiaries engaged in steel production.

Rolled steel products have traditionally been sold on a basing point system.[4] Prior to World War II rolled steel was sold on the West Coast at a price computed on the basis of eastern basing points, even though both United States Steel and Bethlehem Steel produced rolled steel products in California. Fabricators such as Consolidated thus did not get the full benefit of their proximity to the western market. The competitive disadvantages under which western fabricators worked is illustrated by the fact that United States Steel has been the largest seller of fabricated structural steel in the Consolidated market, even though it has no fabricating plants in the area. During the ten-year period ending in 1946, 100 different concerns bid successfully in competition with United States Steel for the sale of fabricated structural products

---

[3] Louisiana and Texas, which are included in the Consolidated market, are not listed in the census grouping, whereas Colorado and Wyoming, which are listed in the census, are excluded from the Consolidated market. Sixteenth Census of the United States, 1940, Areas of the United States 1940, Bureau of the Census, p. 3.

[4] In 1924 the Federal Trade Commission entered an order which concluded that United States Steel had violated § 2 of the Clayton Act and § 5 of the Federal Trade Commission Act by its so-called "Pittsburgh plus" method of pricing, according to which all rolled steel products were sold at a delivered price including freight from Pittsburgh to the destination, regardless of the actual point of shipment. *Matter of United States Steel Corp.*, 8 F. T. C. 1. United States Steel was ordered to cease and desist from selling its products on that basis, or from employing any basing point other than the point of manufacture or shipment. In 1938 United States Steel filed a petition to review that order in the Third Circuit Court of Appeals admitting that United States Steel had never complied with the latter part of the order. No decision has yet been reached in that proceeding.

in the Consolidated market; 50 of those concerns are located outside the area. United States Steel's principal competitor as measured on a national basis, Bethlehem Steel, does have fabricating facilities in California, however, and prior to World War II United States Steel had prepared plans for the erection of fabricating facilities in California. The war made it necessary to postpone the plans. This use of eastern basing points makes past figures on rolled steel product sales from producers in the Consolidated market unreliable in determining effective competition for the future sales of rolled steel in that market. United States Steel now uses Geneva as a basing point.

The urgent wartime demand for steel prompted the government to construct new rolled steel plants in the West. The largest of these plants was erected at Geneva, Utah, at a cost of nearly $200,000,000, and was designed, constructed, and operated by United States Steel for the account of the government. The plant had an annual capacity of more than 1,200,000 tons of ingots, which in turn could be employed to make 700,000 tons of plates and 250,000 tons of shapes. Another large plant was erected by the government at Fontana, California. This is now operated through arrangements of private parties with the government. In January 1945 United States Steel considered the acquisition of the Geneva plant, but because of the speculative nature of the venture and attacks by people within and without the government, United States Steel decided not to submit a bid and notified the Defense Plant Corporation to that effect on August 8, 1945. Shortly thereafter the Surplus Property Administrator wrote to Benjamin F. Fairless, President of United States Steel, advising him that a bid by United States Steel would be welcomed. On May 1, 1946, United States Steel submitted a bid for the Geneva plant of $47,500,000. The terms of the bid provided that United

States Steel would spend not less than $18,000,000 of its own funds to erect additional facilities at Geneva, and $25,000,000 to erect a cold-reduction mill at Pittsburg, California, to consume 386,000 tons of hot rolled coils produced at Geneva.[5] The bid estimated that a sufficient market could be found to absorb an annual production ranging from 456,000 to 600,000 tons. The bid stipulated that Geneva products would be sold with Geneva as a basing point. This would offer possibilities for a reduction in the price of rolled steel products to West Coast purchasers and their customers. The variation between 456,000 and 600,000 tons depended on the consumption of rolled steel products by users other than United States Steel's new Pittsburg plant. The bid noted that additional steel consuming manufacturing plants might be located in the West which would provide a market for additional rolled steel products. Apart from the cold-reduction mill to be erected at Pittsburg, the bid was silent as to the acquisition of fabricating facilities by United States Steel to provide a market for Geneva products.

On May 23, 1946, the War Assets Administration announced that the bid of United States Steel was accepted. An accompanying memorandum discussed in detail the six bids which had been received, and concluded that United States Steel's bid was the most advantageous. The other bids were found unacceptable for a number of reasons; either the bidder could offer no assurance of his financial responsibility or his ability to operate the plant, or the price offered was too low, or the bidder requested

---

[5] Cold rolling is the name given to the process of rolling steel products at temperatures ranging from 50° F. to 240° F. Coils which have been produced by the hot rolling process are fed into a cold-reduction mill and rolled into strip and sheets which are of much higher quality than hot rolled strip and sheets. See Camp and Francis, *The Making, Shaping and Treating of Steel* (5th ed., 1940), pp. 1227–1245.

the government to lend the bidder large sums for the erection of additional facilities or to erect such facilities at government expense.[6]  The memorandum noted that the successful bid would "foster the development in the West of new independent enterprise" by encouraging the location of steel-consuming manufacturing plants in the western states.

On June 17, 1946, the Attorney General advised the War Assets Administration that the proposed sale did not in his opinion constitute a violation of the antitrust laws, and the sale was consummated two days thereafter.  The opinion of the Attorney General was requested in accordance with § 20 of the Surplus Property Act of 1944, 58 Stat. 765, 775, which requires such procedure when government plants costing more than $1,000,000 are being sold.  That section provides that nothing in the Surplus Property Act "shall impair, amend, or modify the antitrust laws or limit and prevent their application to persons" who buy property under the Act.  The Attorney General noted that the ingot capacity of United States Steel had declined from 35.3% of the total national capacity in 1939 to 31.4% in 1946, and that if the Geneva plant were acquired, the percentage would be increased to 32.7%.  Considering only the Pacific Coast and Mountain states, the acquisition of Geneva, the Attorney General said, would increase United States Steel's percentage of capacity in that area from 17.3% to 39%.  United States Steel, however, estimated that

[6] The bid of Colorado Fuel & Iron Corp. proposed that the government spend $47,935,000 for the erection of additional facilities, including over $25,000,000 for the erection of a sheet and tin-plate mill.  The bid of Pacific-American Steel Iron Corp. proposed that the government lend the bidder $25,000,000 for the erection of a tin-plate mill.  The bid of Riley Steel Co. proposed that the government lend the bidder $28,844,000 for the construction of a sheet mill, tube mill, and additions to the structural mill.

on acquisition of Geneva it would have 51% of ingot capacity in the Pacific Coast area. On the basis of these figures construed in the light of *United States* v. *Aluminum Co. of America,* 148 F. 2d 416, and *American Tobacco Co.* v. *United States,* 328 U. S. 781, the Attorney General concluded that the proposed sale, as such, would not violate the antitrust laws. The letter added that no opinion was expressed as to the legality of any acts or practices in which United States Steel might have engaged or in which it might engage in the future. See for a comparable situation *United States* v. *United States Steel Corp.,* 251 U. S. 417, 446.

Prior to the sale of the Geneva plant, Alden G. Roach, President of Consolidated, approached Fairless of United States Steel and indicated that he would like to sell the business of Consolidated. Roach also had conversations with representatives of Bethlehem and Kaiser with regard to the same end. Roach mentioned the subject again to Fairless in February or March of 1946, and Fairless replied that United States Steel was restudying its decision not to bid on the Geneva plant, and did not want to discuss the purchase of Consolidated until the Geneva issue was decided. After the sale of Geneva was effected in June, Fairless spoke again with Roach and arranged to have a committee from United States Steel make an investigation of the Consolidated plants in August. The committee reported that it would cost $14,000,000 and take three years to construct plants equivalent to those owned by Consolidated, and that the Consolidated properties had a depreciated value of $9,800,000. After further negotiations the parties agreed on a price of approximately $8,250,000, and a purchase agreement was executed on December 14 according to which Columbia agreed to buy the physical assets of Consolidated and four subsidiaries. Fairless testified on the witness stand that United States Steel's purpose in purchasing Consolidated was to assure a market for plates and shapes produced at Geneva, and

Roach testified that Consolidated's purpose was to with-
draw the stockholders' equity from the fabrication busi-
ness with its cyclical fluctuations at a time when a favor-
able price could be realized.

## I.

The theory of the United States in bringing this suit
is that the acquisition of Consolidated constitutes an
illegal restraint of interstate commerce because all manu-
facturers except United States Steel will be excluded from
the business of supplying Consolidated's requirements of
rolled steel products, and because competition now exist-
ing between Consolidated and United States Steel in the
sale of structural fabricated products and pipe will be
eliminated.    In addition, the government alleges that the
acquisition of Consolidated, viewed in the light of the
previous series of acquisitions by United States Steel,
constitutes an attempt to monopolize the production and
sale of fabricated steel products in the Consolidated
market.    The appellees contend that the amount of com-
petition which will be eliminated is so insignificant that
the restraint effected is a reasonable restraint not an at-
tempt to monopolize and not prohibited by the Sherman
Act.[7]    On the record before us and in agreement with the

---

[7] This was not a purchase of stock of a competing company.  See
§ 7, Clayton Act, 38 Stat. 730, 731; *Federal Trade Comm'n* v. *Western
Meat Co.*, 272 U. S. 554.  It must be assumed, however, that the
public policy announced by § 7 of the Clayton Act is to be taken into
consideration in determining whether acquisition of assets of Con-
solidated by United States Steel with the same economic results as
the purchase of the stock violates the prohibitions of the Sherman
Act against unreasonable restraints.   See Handler, *Industrial Mergers
and the Anti-Trust Laws,* 32 Col. L. Rev. 179, 266.

In 1941 the Temporary National Economic Committee proposed
that § 7 be amended to apply to acquisition of assets and to require
prior approval by the Federal Trade Commission.   See Comment, 57
Yale L. J. 613, for a description of the bills which have been intro-
duced before Congress to carry out these recommendations.

trial court we conclude that the government has failed to prove its contention that the acquisition of Consolidated would unreasonably lessen competition in the three respects charged, and therefore the proposed contract is not forbidden by § 1 of the Sherman Act. We further hold that the government has failed to prove an attempt to monopolize in violation of § 2.

We turn first to the charge that the proposed purchase will lessen competition by excluding producers of rolled steel products other than United States Steel from supplying the requirements of Consolidated. Over the ten-year period from 1937 to 1946 Consolidated purchased over two million tons of rolled steel products, including the abnormally high wartime requirements. Whatever amount of rolled steel products Consolidated uses in the future will be supplied insofar as possible from other subsidiaries of United States Steel, and other producers of rolled steel products will lose Consolidated as a prospective customer.

The parties are in sharp dispute as to the size and nature of the market for rolled steel products with which Consolidated's consumption is to be compared. The appellees argue that rolled steel products are sold on a national scale, and that for the major producers the entire United States should be regarded as the market. Viewed from this standpoint, Consolidated's requirements are an insignificant fraction of the total market, less than ½ of 1%. The government argues that the market must be more narrowly drawn, and that the relevant market to be considered is the eleven-state area in which Consolidated sells its products, and further that in that area by considering only the consumption of structural and plate fabricators a violation of the Sherman Act has been established. If all sales of rolled steel products in the Consolidated market are considered, Consolidated's purchases of two million tons represent a little more than

3% of the total of 60 million tons. The figure is not appreciably different if the five-year period 1937–41 or 1946 alone is used as the measuring period.[8] If the comparable market is construed even more narrowly, and is restricted to the consumption of plates and shapes in the Consolidated market, figures for 1937 indicate that Consolidated's consumption of plates and shapes was 13% of the total. Data are offered by the government for 1946 which are too uncertain to furnish a reliable guide.[9]

[8] The following table was accepted by the trial court as correct:

| Year | Industry production all rolled steel products | U. S. Steel subsidiaries production all rolled steel products | Estimated consumption all rolled steel products 11 States | U. S. Steel subsidiaries shipment of all rolled steel production into the 11 States | Consolidated's purchases all rolled steel products |
|---|---|---|---|---|---|
| 1937 | 38,345,158 | 14,097,666 | 4,362,900 | 1,556,085 | 103,286 |
| 1938 | 21,356,398 | 7,315,506 | 2,670,000 | 1,046,287 | 44,050 |
| 1939 | 34,955,175 | 11,707,251 | 3,630,000 | 1,434,383 | 69,862 |
| 1940 | 45,965,971 | 15,013,749 | 4,337,990 | 1,686,129 | 117,644 |
| 1941 | 60,942,979 | 20,416,604 | 6,008,757 | 2,441,840 | 163,428 |
| 1942 | 60,591,052 | 20,615,137 | 8,489,204 | 3,181,358 | 339,711 |
| 1943 | 62,210,261 | 20,147,616 | 10,124,831 | 3,706,886 | 404,180 |
| 1944 | 63,250,519 | 21,052,179 | 9,587,503 | 3,495,231 | 390,532 |
| 1945 | 56,602,322 | 18,410,264 | 7,232,590 | 2,378,112 | 225,273 |
| 1946 | 48,993,777 | 15,181,719 | 6,000,000 | 1,810,982 | 178,669 |
| Total | 493,213,612 | 163,957,691 | 62,443,775 | 22,737,293 | 2,036,635 |

[9] The government notes that United States Steel in its bid for the Geneva plant estimated that the postwar market in seven Western states would be 227,000 tons of plates and 213,000 tons of shapes per year, and compares with these figures the 1946 purchases of Consolidated of 107,128 tons of plates and 43,770 tons of shapes. Apart from the fact that the figures for estimated consumption included only seven states as against eleven in the Consolidated market, Consolidated's purchases in 1946 were principally devoted to finishing up war contracts. The figures for estimated consumption were based on the assumption that the level of activity would be considerably lower than during the war.

The government realizes the force of appellees' argument that rolled steel products are sold on a national scale, and attempts to demonstrate that during the non-war years 80% of Consolidated's requirements were produced on the West Coast; Consolidated resorts to data not in the record to demonstrate that in fact only 26% of Consolidated's rolled steel purchases were produced in plants located in the Consolidated market area.[10]  Whether we accept the government's or Consolidated's figures, however, they are of little value in determining the extent to which West Coast fabricators will purchase rolled steel products in the eastern market in the future, since the construction of new plants at Geneva and Fontana and the creation of new basing points on the West Coast will presumably give West Coast rolled steel producers a far larger share of the West Coast fabricating market than before the war.

Another difficulty is that the record furnishes little indication as to the propriety of considering plates and shapes as a market distinct from other rolled steel products.  If rolled steel producers can make other products as easily as plates and shapes, then the effect of the removal of Consolidated's demand for plates and shapes must be measured not against the market for plates and shapes alone, but for all comparable rolled products.  The record suggests, but does not conclusively indicate, that rolled steel producers can make other products interchangeably with shapes and plates, and that therefore

---

[10] The table from which the government derives this figure of 80% is inconclusive.  It refers to "Purchases from West Coast Producers" and does not indicate whether the producers themselves produced the rolled steel products or were acting as agents of eastern producers. There is no challenge to Consolidated's statement that during the years 1937–41 and 1946 deliveries to it from the rolled steel production of the West Coast totaled 208,093 tons as against 495,848 tons from eastern producers.

we should not measure the potential injury to competition by considering the total demand for shapes and plates alone, but rather compare Consolidated's demand for rolled steel products with the demand for all comparable rolled steel products in the Consolidated marketing area.

We read the record as showing that the trial court did not accept the theory that the comparable market was restricted to the demand for plates and shapes in the Consolidated area, but did accept the government's theory that the market was to be restricted to the total demand for rolled steel products in the eleven-state area. On that basis the trial court found that the steel requirements of Consolidated represented "a small part" of the consumption in the Consolidated area, that Consolidated was not a "substantial market" for rolled steel producers selling in competition with United States Steel, and that the acquisition of Consolidated would not injure any competitor of United States Steel engaged in the production and sale of rolled steel products in the Consolidated market or elsewhere. We recognize the difficulty of laying down a rule as to what areas or products are competitive, one with another. In this case and on this record we have circumstances that strongly indicate to us that rolled steel production and consumption in the Consolidated marketing area is the competitive area and product for consideration.

In analyzing the injury to competition resulting from the withdrawal of Consolidated as a purchaser of rolled steel products, we have been considering the acquisition of Consolidated as a step in the vertical integration of United States Steel. Regarded as a seller of fabricated steel products rather than as a purchaser of rolled steel products, however, the acquisition of Consolidated may be regarded as a step in horizontal integration as well, since United States Steel will broaden its facilities for

steel fabrication through the purchase of Consolidated. In determining the extent of competition between Consolidated and the two structural fabrication subsidiaries of United States Steel in the sale of fabricated steel products, we must again determine the size of the market in which the two companies may be said to compete. The parties agree that United States Steel does no plate fabrication, and that competition is restricted to fabricating structural steel products and pipe. Consolidated makes pipe by bending and welding plates, whereas National Tube, a United States Steel subsidiary, makes seamless pipe through a process which the parties agree does not fall under the heading of steel fabrication.

We turn first to the field of fabricated structural steel products. As in the case of rolled steel, the appellees claim that structural fabricators sell on a national scale, and that Consolidated's production must be measured against all structural fabricators. An index of the position of Consolidated as a structural fabricator is shown by its bookings for the period 1937–1942, as reported by the American Institute of Steel Construction. During that period total bookings in the entire country were nearly 10,000,000 tons, of which Consolidated's share was only 84,533 tons. The government argues that competition is to be measured with reference to the eleven-state area in which Consolidated sells its products. Viewed on that basis, total bookings for the limited area for the six-year period were 1,665,698, of which United States Steel's share was 17% and Consolidated's 5%. The government claims that Consolidated has become a more important factor since that period, and alleges that bookings for 1946 in the Consolidated market were divided among 90 fabricators, of which United States Steel had 13% and Consolidated and Bethlehem Steel each had 11%. The next largest structural fabricators had 9%,

6% and 3% of the total.[11]   Although the appellees challenge the accuracy of the government's 1946 figures, and the district court made no reference to them in the findings, we accept them as sufficiently reliable for our present purpose.   The figures on which the government relies demonstrate that at least in the past competition in structural steel products has been conducted on a national scale.   Five out of the ten structural fabricators having the largest sales in the Consolidated market perform their fabrication operations outside the area, including United States Steel and Bethlehem Steel.   Purchasers of fabricated structural products have been able to secure bids from fabricators throughout the country, and therefore statistics showing the share of United States Steel and Consolidated in the total consumption of fabricated structural products in any prescribed area are of little probative value in ascertaining the extent to which consumers of these products would be injured through elimination of competition between the two companies.

[11] *10 largest structural steel fabricators in the 11 Western States, 1946.*

| Company | Location | Bookings (net tons) | Percent of total |
|---|---|---|---|
| All companies | | 336,717 | 100.0 |
| United States Steel Corp | Pittsburgh, Pa | 44,083 | 12.9 |
| Consolidated Steel Corp | Los Angeles, Calif | 36,142 | 10.6 |
| Bethlehem Steel Co | Bethlehem, Pa | 36,047 | 10.6 |
| Mosher Steel Co | Houston, Tex | 29,814 | 8.7 |
| Chicago Bridge & Iron Co | Chicago, Ill | 21,588 | 6.3 |
| Isaacson Iron Works | Seattle, Wash | 10,656 | 3.1 |
| Kansas City Structural Co | Kansas City, Kans | 10,051 | 2.9 |
| Midwest Steel & Iron Works Co | Denver, Colo | 9,306 | 2.7 |
| Northwest Steel Rolling Mills, Inc | Seattle, Wash | 9,000 | 2.6 |
| Structural Steel & Forge Co | Salt Lake City, Utah | 8,300 | 2.4 |
| Total 10 companies | | 214,987 | 63.0 |
| Remaining 80 companies | | 121,730 | 37.0 |

The table quoted includes a correction as to Consolidated's bookings which was made after the exhibit was introduced.

As in the case of rolled steel products, however, wartime developments have made prewar statistics of little relevance. The appellees urge three reasons why eastern fabricators will be at a competitive disadvantage with western fabricators for the western market: the availability of rolled steel products from the Geneva plant and other West Coast plants at a lower price, the increase in commercial freight rates on fabricated products, and the abolition of land grant rates. The increase in freight rates has made it less profitable for eastern fabricators to sell in the West, and the elimination of land grant rates on government shipments has made it less profitable for eastern fabricators to sell to government agencies in the West. Whatever competition may have existed in the past between Consolidated and the two bridge company subsidiaries of United States Steel, the appellees urge, will exist to a much lesser extent in the future.[12] Consequently, even though the government may be correct in claiming that the eleven-state area is the proper market for measuring competition with Consolidated, the government may not at the same time claim that prewar statistics as to United States Steel's share of that market are of major significance.

Apart from the question of the geographical size of the market, the appellees urge that the bookings for fabricated structural steel products are of little significance

---

[12] The trial court found that the fabricating subsidiaries of United States Steel would be eliminated from the West Coast market in the future except for specialized products which they are equipped to fabricate economically and which sell at higher prices per ton of product.

Since the record was made up in this case, United States Steel has announced that the mill price for Geneva steel products has been reduced $3 per ton, effective May 1, 1948. That amount represented the previously existing mill price differential of Geneva steel products over products produced at Pittsburgh, Chicago, Gary, and Birmingham. U. S. Steel Quarterly, Vol. 2, No. 2, May 1948, p. 6.

because Consolidated and United States Steel make different types of structural steel products. In view of the fact that structural steel jobs are fabricated on an individual basis, it is difficult to compare the output of United States Steel with that of Consolidated, but the appellees argue that in general Consolidated does only light and medium fabrication, whereas United States Steel does heavy fabrication. The appellees support their argument with an elaborate statistical analysis of bids by the two companies. Those figures show that Consolidated and United States Steel submitted bids for the same project in a very small number of instances.[13] Such figures are not conclusive of lack of competition; the government suggests that knowledge that one party has submitted a bid may discourage others from bidding. The government has introduced very little evidence, however, to show that in fact the types of structural steel products sold by Consolidated are similar to those sold by United States Steel. The appellees further urge that only a small proportion of Consolidated's business fell in the

---

[13] During the ten-year period ending in 1946 United States Steel bid on 2,409 jobs in the Consolidated area and was successful in 839. Consolidated bid on 6,377 jobs and was successful in 2,390. There were only 166 jobs, however, on which both companies bid. Forty of these jobs on which both companies bid were awarded to United States Steel, 35 were awarded to Consolidated, and 91 were awarded to competitors. Reducing these figures to a tonnage basis, United States Steel was awarded bids covering 499,605 tons out of a total tonnage on which bids were submitted of 1,273,152 tons. Consolidated bid on jobs involving 578,847 tons and was awarded 157,997 tons. The tonnage involved in the 166 common bids was 122,353 tons, of which United States Steel's share was 38,920, Consolidated's 24,162, and other competitors 59,271.

The above figures indicate that Consolidated customarily bid on lighter types of work; the average tonnage for Consolidated's bids was 90 tons, whereas the average tonnage for United States Steel was 528 tons. The 166 jobs on which both companies submitted bids were considerably larger in volume, averaging 737 tons.

category of structural steel products, and that as to plate fabrication and miscellaneous work there was no competition with United States Steel whatsoever. The trial court found on this issue that 16% of Consolidated's business was in structural steel products and 70% in plate fabrication. On the basis of the statistics here summarized, the trial court found that competition between the two companies in the manufacture and sale of fabricated structural steel products was not substantial.

The government also argues that competition will be eliminated between Consolidated and National Tube in the sale of pipe. In this field we have no difficulty in determining the geographical scope of the market to be considered in determining the extent of competition, since the government claims that Consolidated and National Tube compete on a nation-wide scale in the field of large diameter pipe for oil and gas pipelines. Other types of pipe made by the two concerns are apparently not competitive as the government does not contest this assertion of the appellees.[14] Consolidated in the past has special-

---

[14] The following extract from the record summarizes the evidence on this question:

"A. The type of pipe made by Consolidated is electric weld pipe known as fusion weld or arc weld pipe in sizes from 4-inch up to say 30-inch. We don't make any electric weld pipe. The pipe that Consolidated make other than the pipe larger than 26-inch is made primarily for and sold to the water works industry, and our pipe is sold primarily to the oil and gas industry. We don't make the same type of pipe, and the sizes which we manufacture and the gages and the lengths are in general quite different from those made by Consolidated Steel. They only overlap at a very small part of the field insofar as the physical dimensions of the pipe are concerned.

"Q. You have spoken of pipe made by Consolidated for water conveyance. Are those what have been referred to as penstocks?

"A. No, sir. Well, yes, to a certain extent penstocks, and many other types of low-pressure water pipe. It is true that penstocks are included in that as far as Consolidated is concerned. National

ized in comparatively light walled pipe for low pressure purposes, such as irrigation and water transmission, whereas National Tube has made a heavy walled pipe for high pressure purposes which is used chiefly in the oil and gas industry. National Tube pipe is substantially cheaper to produce. The record does show, however, that in the last few years Consolidated has supplied large diameter pipe for oil and gas pipelines on at least four occasions in three of which National Tube also supplied part of the pipe requirements.[15] Although the record does not show the extent of Consolidated's business in this field, one of the witnesses estimated that Consolidated's contract to furnish 90% of the pipe for the Trans-Arabian pipeline would run to almost $30,000,000. The appellees seek to minimize the importance of competition in this field by pointing out that the pipe to be used for the Trans-Arabian pipeline is 30 and 31 inches in diameter, which is too large a size to be made by the seamless process employed by National Tube. The record is barren on the

Tube Company do not make any penstock pipe. They have not made any for ten years.

"Q. And none of what you term light-pressure pipe?

"A. We don't compete with that. We make high-pressure pipe only."

[15] Roach testified that the first order which Consolidated had filled for such pipe was for the Southern Counties and Southern California gas line, but he did not indicate the size or date of the order. The president of National Tube testified that Consolidated contracted in 1946 to furnish 100 miles of 26-inch pipe for the El Paso Natural Gas Co., National Tube contracted to supply 230 miles, and a third competitor 400 miles. The same witness also testified that National Tube contracted in 1946 to supply a small amount of 24-inch pipe to the Pacific Gas and Electric Co., and that Consolidated in 1947 also agreed to furnish a quantity of pipe for the same pipeline. As of November 30, 1946, Consolidated had unfilled orders for "heavy pipe" of $9,830,079, a figure which does not include the Pacific Gas and Electric or Trans-Arabian order.

comparative production between Consolidated and its competitors, other than United States Steel, in the manufacture of large pipe. The record does show that other major companies, not connected with any of the parties to this proceeding, do manufacture welded and seamless pipe.[16] The appellees further claim that under normal circumstances Consolidated and National Tube would not compete in this field because Consolidated pipe sells for $30 a ton more than National Tube pipe, and that Consolidated is able to sell its pipe only because of the inability of National Tube and other concerns to take on additional orders. The government argues in reply that Consolidated may be able to reduce its costs of production if a sufficiently large volume of orders is obtained, but no evidence is adduced to support such a conclusion.

The opinion of the trial court summarized the facts outlined above, and concluded that there was no substantial competition between National Tube and Consolidated in the sale of pipe; one of the findings went even further, stating that the two companies "do not compete" in the sale of their pipe products.

The trial court also concluded that the government had failed to prove that United States Steel had attempted to monopolize the business of fabricating steel products in the Consolidated market in violation of § 2. The trial judge apparently was of the opinion that since the purchase of Consolidated did not constitute a violation of § 1, it could not constitute a violation of § 2, since every attempt to monopolize must also constitute an illegal restraint. In his findings the trial judge concluded that the purchase agreement was entered into "for sound business reasons" and with no intent to monopolize the production and sale of fabricated steel products.

---

[16] *E. g.*, Republic Steel Corp., A. O. Smith Corp., Youngstown Sheet and Tube Co. There are other producers in the West.

## II.

In support of its position that the proposed contract violates § 1 of the Sherman Act, the government urges that all the legal conclusions of the district court were erroneous. It is argued that, without regard to the percentages of consumption of rolled steel products by Consolidated just considered, the acquisition by United States Steel of Consolidated violates the Sherman Act. Such an arrangement, it is claimed, excludes other producers of rolled steel products from the Consolidated market and constitutes an illegal restraint *per se* to which the rule of reason is inapplicable. Or, phrasing the argument differently, the government's contention seems to be that the acquisition of facilities which provide a controlled market for the output of the Geneva plant is a process of vertical integration and invalid *per se* under the Sherman Act. The acquisition of Consolidated, it is pointed out, would also eliminate competition between Consolidated and the subsidiaries of United States Steel in the sale of structural steel products and pipe products, and would eliminate potential competition from Consolidated in the sale of other steel products. We also note that the acquisition of Consolidated will bring United States Steel for the first time into the field of plate fabrication.

A. We first lay to one side a possible objection to measuring the injury to competition by reference to a market which is less than nation-wide in area. The Sherman Act is not limited to eliminating restraints whose effects cover the entire United States; we have consistently held that where the relevant competitive market covers only a small area the Sherman Act may be invoked to prevent unreasonable restraints within that area. In *United States* v. *Yellow Cab Co.,* 332 U. S. 218, we sustained the validity of a complaint which alleged that the defendants had monopolized the cab operating business in four large

cities.[17]   It is the volume in the area which the alleged restraints affect that is important.   In *United States* v. *Griffith,* 334 U. S. 100, we found restraint of trade by a chain of motion picture exhibitors covering a small area. Although our previous discussion has indicated the difficulties in accepting the eleven-state area in which Consolidated sells its products as the relevant competitive market, we accept for the purposes of decision the government's argument that this area is the one to be considered in measuring the effect on competition of the withdrawal of Consolidated as a market for other rolled steel producers and of the bringing together under common control of Consolidated and the fabricating subsidiaries of United States Steel.

B. The government relies heavily on *United States* v. *Yellow Cab Co., supra,* to support its argument that the withdrawal of Consolidated as a possible consumer for the

---

[17] 332 U. S. at 226:

"Likewise irrelevant is the importance of the interstate commerce affected in relation to the entire amount of that type of commerce in the United States.   The Sherman Act is concerned with more than the large, nation-wide obstacles in the channels of interstate trade. It is designed to sweep away all appreciable obstructions so that the statutory policy of free trade might be effectively achieved.   As this Court stated in *Indiana Farmer's Guide Co.* v. *Prairie Farmer Co.,* 293 U. S. 268, 279, 'The provisions of §§ 1 and 2 have both a geographical and distributive significance and apply to any part of the United States as distinguished from the whole and to any part of the classes of things forming a part of interstate commerce.'   It follows that the complaint in this case is not defective for failure to allege that CCM has a monopoly with reference to the total number of taxicabs manufactured and sold in the United States.   Its relative position in the field of cab production has no necessary relation to the ability of the appellees to conspire to monopolize or restrain, in violation of the Act, an appreciable segment of interstate cab sales. An allegation that such a segment has been or may be monopolized or restrained is sufficient."

goods of other rolled steel producers constitutes an illegal restraint. The complaint in the *Yellow Cab* case charged that there was a plan, an intent, to monopolize the cab business, from manufacture through operation in the four large cities, by acquiring cab operating companies or interests therein; tying those companies into a cab manufacturing company and requiring the operating companies to purchase their cabs from the manufacturer at a price above the prevailing market. There was no allegation that the volume of cab production which was thus excluded as a market for rival cab manufacturers was a substantial proportion of the total volume of cabs produced, and the government concludes that the case stands for the proposition that it is illegal *per se* for a manufacturer to preempt any market for his goods through vertical integration provided that an "appreciable" amount of interstate commerce is involved.[18]

We do not construe our holding in the *Yellow Cab* case to make illegal the acquisition by United States Steel of this outlet for its rolled steel without consideration of its effect on the opportunities of other competitor pro-

---

[18] The government relies particularly on the following excerpt, 332 U. S. at 226–27:

"Nor can it be doubted that combinations and conspiracies of the type alleged in this case fall within the ban of the Sherman Act. By excluding all cab manufacturers other than CCM from that part of the market represented by the cab operating companies under their control, the appellees effectively limit the outlets through which cabs may be sold in interstate commerce. Limitations of that nature have been condemned time and again as violative of the Act. . . . In addition, by preventing the cab operating companies under their control from purchasing cabs from manufacturers other than CCM, the appellees deny those companies the opportunity to purchase cabs in a free, competitive market. The Sherman Act has never been thought to sanction such a conspiracy to restrain the free purchase of goods in interstate commerce."

ducers to market their rolled steel.[19]   In discussing the
charge in the *Yellow Cab* case, we said that the fact
that the conspirators were integrated did not insulate
them from the act, not that corporate integration vio-
lated the act.   In the complaint the government charged
that the defendants had combined and conspired to
effect the restraints in question with the intent and pur-
pose of monopolizing the cab business in certain cities, and
on motion to dismiss that allegation was accepted as true.
Where a complaint charges such an unreasonable re-
straint as the facts of the *Yellow Cab* case show, the
amount of interstate trade affected is immaterial in de-
termining whether a violation of the Sherman Act has
been charged.   A restraint may be unreasonable either
because a restraint otherwise reasonable is accompanied
with a specific intent to accomplish a forbidden restraint
or because it falls within the class of restraints that are
illegal *per se*.   For example, where a complaint charges
that the defendants have engaged in price fixing,[20] or have
concertedly refused to deal with non-members of an asso-
ciation,[21] or have licensed a patented device on condition
that unpatented materials be employed in conjunction
with the patented device,[22] then the amount of commerce
involved is immaterial because such restraints are illegal

---

[19] The general language of §§ 1 and 2 of the Sherman Act has
been construed as prohibiting only unreasonable restraints, not all
possible restraints of trade. *Standard Oil Co.* v. *United States,*
221 U. S. 1.   In this it differs somewhat from the more specific
language of the Clayton Act, 38 Stat. 730, or the Federal Trade
Commission Act, 38 Stat. 717.   See *Federal Trade Comm'n* v. *Morton
Salt Co.,* 334 U. S. 37, 46, and *Standard Fashion Co.* v. *Magrane-
Houston Co.,* 258 U. S. 346, 356.

[20] *United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150.

[21] *Associated Press* v. *United States,* 326 U. S. 1; *Eastern States
Retail Lumber Dealers' Association* v. *United States,* 234 U. S. 600;
*Montague & Co.* v. *Lowry,* 193 U. S. 38.   See *Fashion Originators'
Guild* v. *Federal Trade Comm'n,* 312 U. S. 457.

[22] *International Salt Co.* v. *United States,* 332 U. S. 392.

*per se.* Nothing in the *Yellow Cab* case supports the theory that all exclusive dealing arrangements are illegal *per se.*

A subsidiary will in all probability deal only with its parent for goods the parent can furnish. That fact, however, does not make the acquisition invalid. When other elements of Sherman Act violations are present, the fact of corporate relationship is material and can be considered in the determination of whether restraint or attempt to restrain exists. That this is the teaching of the *Yellow Cab* case is indicated by the following quotation:

> "And so in this case, the common ownership and control of the various corporate appellees are impotent to liberate the alleged combination and conspiracy from the impact of the Act. The complaint charges that the restraint of interstate trade was not only effected by the combination of the appellees but was the primary object of the combination. The theory of the complaint, to borrow language from *United States* v. *Reading Co.*, 253 U. S. 26, 57, is that 'dominating power' over the cab operating companies 'was not obtained by normal expansion to meet the demands of a business growing as a result of superior and enterprising management, but by deliberate, calculated purchase for control.' If that theory is borne out in this case by the evidence, coupled with proof of an undue restraint of interstate trade, a plain violation of the Act has occurred." 332 U. S. at 227–28.

That view is in accord with previous decisions of the Court.[23]

---

[23] Compare our statement in *United States* v. *Paramount Pictures*, 334 U. S. 131, 173–174:

"Exploration of these phases of the cases would not be necessary if, as the Department of Justice argues, vertical integration of pro-

The legality of the acquisition by United States Steel of a market outlet for its rolled steel through the purchase of the manufacturing facilities of Consolidated depends not merely upon the fact of that acquired control but also upon many other factors. Exclusive dealings for rolled steel between Consolidated and United States Steel, brought about by vertical integration or otherwise, are not illegal, at any rate until the effect of such control is to unreasonably restrict the opportunities of competitors to market their product.

In *United States* v. *Paramount Pictures*, 334 U. S. 131, we were presented with a situation in which the government charged that vertical integration was illegal under the Sherman Act. We held that control by the major producer-distributors over nearly three-quarters of the first-run theaters in cities with population over 100,000 was not of itself illegal, and we remanded the case to the district court for further findings. In outlining the factors which we considered to be significant in determining the legality of vertical integration, we emphasized the importance of characterizing the nature of the market to be served, and the leverage on the market which the particular vertical integration creates or makes possible. A second test which we considered important in the

---

ducing, distributing and exhibiting motion pictures is illegal *per se.* But the majority of the Court does not take that view. In the opinion of the majority the legality of vertical integration under the Sherman Act turns on (1) the purpose or intent with which it was conceived, or (2) the power it creates and the attendant purpose or intent. First, it runs afoul of the Sherman Act if it was a calculated scheme to gain control over an appreciable segment of the market and to restrain or suppress competition, rather than an expansion to meet legitimate business needs."

The legality of contractual arrangements for exclusive dealing was sustained in *United States* v. *Bausch & Lomb Co.,* 321 U. S. 707, 728–29. Compare *Federal Trade Comm'n* v. *Curtis Publishing Co.,* 260 U. S. 568.

*Paramount* case was the purpose or intent with which the combination was conceived. When a combination through its actual operation results in an unreasonable restraint, intent or purpose may be inferred; even though no unreasonable restraint may be achieved, nevertheless a finding of specific intent to accomplish such an unreasonable restraint may render the actor liable under the Sherman Act. Compare *United States* v. *Griffith*, 334 U. S. 100, 105.[24]

It seems clear to us that vertical integration, as such without more, cannot be held violative of the Sherman Act. It is an indefinite term without explicit meaning. Even in the iron industry, where could a line be drawn—at the end of mining the ore, the production of the pig-iron or steel ingots, when the rolling mill

---

[24] *Id.*, pp. 106–107:

"Anyone who owns and operates the single theatre in a town, or who acquires the exclusive right to exhibit a film, has a monopoly in the popular sense. But he usually does not violate § 2 of the Sherman Act unless he has acquired or maintained his strategic position, or sought to expand his monopoly, or expanded it by means of those restraints of trade which are cognizable under § 1. For those things which are condemned by § 2 are in large measure merely the end products of conduct which violates § 1. *Standard Oil Co.* v. *United States*, 221 U. S. 1, 61. But that is not always true. Section 1 covers contracts, combinations, or conspiracies in restraint of trade. Section 2 is not restricted to conspiracies or combinations to monopolize but also makes it a crime for any person to monopolize or to attempt to monopolize any part of interstate or foreign trade or commerce. So it is that monopoly power, whether lawfully or unlawfully acquired, may itself constitute an evil and stand condemned under § 2 even though it remains unexercised. For § 2 of the Act is aimed, *inter alia*, at the acquisition or retention of effective market control. See *United States* v. *Aluminum Co. of America*, 148 F. 2d 416, 428, 429. Hence the existence of power 'to exclude competition when it is desired to do so' is itself a violation of § 2, provided it is coupled with the purpose or intent to exercise that power. *American Tobacco Co.* v. *United States*, 328 U. S. 781, 809, 811, 814."

operation is completed, fabrication on order or at some stage of manufacture into standard merchandise? No answer would be possible and therefore the extent of permissible integration must be governed, as other factors in Sherman Act violations, by the other circumstances of individual cases. Technological advances may easily require a basic industry plant to expand its processes into semi-finished or finished goods so as to produce desired articles in greater volume and with less expense.

It is not for courts to determine the course of the Nation's economic development. Economists may recommend, the legislative and executive branches may chart legal courses by which the competitive forces of business can seek to reduce costs and increase production so that a higher standard of living may be available to all. The evils and dangers of monopoly and attempts to monopolize that grow out of size and efforts to eliminate others from markets, large or small, have caused Congress and the Executive to regulate commerce and trade in many respects. But no direction has appeared of a public policy that forbids, *per se,* an expansion of facilities of an existing company to meet the needs of new markets of a community, whether that community is nation-wide or county-wide. On the other hand, the courts have been given by Congress wide powers in monopoly regulation. The very broadness of terms such as restraint of trade, substantial competition and purpose to monopolize have placed upon courts the responsibility to apply the Sherman Act so as to avoid the evils at which Congress aimed. The basic industries, with few exceptions, do not approach in America a cartelized form. If businesses are to be forbidden from entering into different stages of production that order must come from Congress, not the courts.

Applying the standards laid down in the *Paramount* case, we conclude that the so-called vertical integration

resulting from the acquisition of Consolidated does not unreasonably restrict the opportunities of the competitor producers of rolled steel to market their product. We accept as the relevant competitive market the total demand for rolled steel products in the eleven-state area; over the past ten years Consolidated has accounted for only 3% of that demand, and if expectations as to the development of the western steel industry are realized, Consolidated's proportion may be expected to be lower than that figure in the future. Nor can we find a specific intent in the present case to accomplish an unreasonable restraint, for reasons which we discuss under heading III of this opinion.

C. We turn now to a discussion of the significance, as to possible violation of the Sherman Act, of the fact that Consolidated has been a competitor of United States Steel in structural steel fabrication and in the manufacture of pipe. The same tests which measure the legality of vertical integration by acquisition are also applicable to the acquisition of competitors in identical or similar lines of merchandise. It is first necessary to delimit the market in which the concerns compete and then determine the extent to which the concerns are in competition in that market. If such acquisition results in or is aimed at unreasonable restraint, then the purchase is forbidden by the Sherman Act. In determining what constitutes unreasonable restraint, we do not think the dollar volume is in itself of compelling significance; we look rather to the percentage of business controlled, the strength of the remaining competition, whether the action springs from business requirements or purpose to monopolize, the probable development of the industry, consumer demands, and other characteristics of the market. We do not undertake to prescribe any set of percentage figures by which to measure the reasonableness of a corporation's enlargement of its activities by the purchase of the assets of a

competitor.[25]   The relative effect of percentage command of a market varies with the setting in which that factor is placed.

The United States makes the point that the acquisition of Consolidated would preclude and restrain substantial potential competition in the production and sale of other steel products than fabricated structural steel and pipe. Force is added to this contention by the fact, adverted to above at pages 500 and 512, that United States Steel does no plate fabrication while Consolidated does.   By plate fabrication Consolidated produces many articles not now produced by United States Steel.   We mention, as examples, boilers, gas tanks, smoke stacks, storage tanks and barges.   Attention is also called to the war activities of Consolidated in steel shipbuilding as indicative of its potentialities as a competitor.   We have noted, pp. 500–501, *supra,* that this construction was under government direction and financing.   We agree that any acquisition of fabricating equipment eliminates some potential competition from anyone who might own or acquire such facilities. We agree, too, with the government's position that potential competition from producers of presently non-competitive articles as well as the possibility that acquired facilities may be used in the future for the production of new articles in competition with others may be taken into consideration in weighing the effect of any acquisition of assets on restraint of trade.[26]

The government's argument, however, takes us into highly speculative situations.   Steel ship construction for war purposes was an enterprise undertaken at government

[25] Compare *United States* v. *Aluminum Co. of America,* 148 F. 2d 416, 424; Handler, *supra,* note 7, tables, p. 245.   See also Rostow, *The New Sherman Act: A Positive Instrument of Progress,* 14 U. of Chicago L. Rev. 567, 575–86.

[26] *United States* v. *Southern Pacific Co.,* 259 U. S. 214; *United States* v. *Reading Co.,* 253 U. S. 26.

expense. We know of nothing from the record that would lead Consolidated or United States Steel to branch out into the peace-time steel ship industry at their own risk. The necessary yards have been sold. It is true that United States Steel might go into plate fabrication. The record shows nothing as to production or demand in the Consolidated trade area for plate fabricated articles. Nothing appears as to the number of producers of such goods in that territory. What we have said in other places in this opinion as to the growing steel industry in this area is pertinent here. Eastern fabricators will find it difficult to meet competition from western fabricators in the western market. Cheaper western rolled steel and freight rates are a handicap to eastern fabricators. Looking at the situation here presented, we are unwilling to hold that possibilities of interference with future competition are serious enough to justify us in declaring that this contract will bring about unlawful restraint.

We conclude that in this case the government has failed to prove that the elimination of competition between Consolidated and the structural fabricating subsidiaries of United States Steel constitutes an unreasonable restraint. If we make the doubtful assumption that United States Steel could be expected in the future to sell 13% of the total of structural steel products in the Consolidated trade area and that Consolidated could be expected to sell 11%, we conclude that where we have the present unusual conditions of the western steel industry and in view of the facts of this case as developed at pages 512 to 516, of this opinion, it can not be said there would be an unreasonable restraint of trade. To hold this does not imply that additional acquisitions of fabricating facilities for structural steel would not become monopolistic. Notwithstanding some differences as to the business of Consolidated and United States Steel in respect to the character of structural steel products fabricated by each, there is

competition between the two for both light and heavy work.  The western steel industry is developing.  Fontana and Geneva as well as other producers are making available for fabricators larger supplies of rolled steel so that the West is becoming less dependent on eastern suppliers.  We are of the opinion, moreover, in view of the number of West Coast fabricators (see pp. 502–503) and the ability of out-of-the-area fabricators to compete because of the specialized character of structural steel production in regard to orders and designs, that this acquisition is permissible.

We likewise conclude that the elimination of competition between Consolidated and National Tube (a United States Steel subsidiary) does not constitute an unreasonable restraint.  Competition at the time of the contract was restricted to the sale of large diameter pipe for oil and gas pipelines, see pages 516 to 518, *supra,* and the only indication in the record that competition in pipe would exist in a broader field in the future is contained in the suggestion, without proof or specification, that Consolidated through technological advances or business expansion, might produce a wider range of pipe sizes and types. This is not enough to persuade us that the purchase will unduly restrain trade in pipe.  The record does show that in three instances Consolidated and National Tube each supplied pipe for a new pipeline.  It is clear that these line pipe contracts were obtained by Consolidated in a seller's market.  We are given nothing as to the national production of oil and gas trunkline pipe or the relation of the pipe sold by Consolidated and National Tube to this production.  The government does not contest appellees' statement that Consolidated pipe for this purpose is substantially more expensive than seamless pipe, and in the absence of a showing that welded pipe has advantages over seamless pipe to compensate for the increased cost or that Consolidated's production costs may be expected

to decline with an increase in volume, it does not seem to us that it has been shown that competition in this field between the parties to this contract is so substantial that its elimination under these circumstances constitutes an unreasonable restraint.

The government cites four antitrust cases involving railroads to support its argument that control by one competitor over another violates the Sherman Act, even though the percentage of business for which they compete may be small.[27]   The appellees cite cases from this Court and lower courts in which acquisition by one competitor of another was held not to violate the antitrust laws.[28] We do not stop to examine those cases to determine whether we would now approve either their language or their holdings.   The factual situation in all those cases is so dissimilar from that presented here that they furnish little guidance in determining whether the competition which will be eliminated through the purchase of Consolidated is sufficient to warrant injunctive relief requested by the government.[29]

## III.

We turn last to the allegation of the government that United States Steel has attempted to monopolize the production and sale of fabricated steel products in the Consolidated market.   We think that the trial court applied too narrow a test to this charge; even though

---

[27] *United States* v. *Southern Pacific Co.,* 259 U. S. 214; *United States* v. *Union Pacific R. Co.,* 226 U. S. 61; *United States* v. *Reading Co.,* 253 U. S. 26; *Northern Securities Co.* v. *United States,* 193 U. S. 197.

[28] *International Shoe Co.* v. *Federal Trade Comm'n,* 280 U. S. 291; *United States* v. *United States Steel Corp.,* 251 U. S. 417; *United States* v. *United Shoe Machinery Co.,* 247 U. S. 32; *United States* v. *Standard Oil Co. of New Jersey,* 47 F. 2d 288; *United States* v. *Republic Steel Corp.,* 11 F. Supp. 117.

[29] See Handler, *supra,* note 7, at 269–71.

the restraint effected may be reasonable under § 1, it may constitute an attempt to monopolize forbidden by § 2 if a specific intent to monopolize may be shown.[30] To show that specific intent, the government recites the long history of acquisitions of United States Steel, and argues that the present acquisition when viewed in the light of that history demonstrates the existence of a specific intent to monopolize. Although this Court held in 1920[31] that United States Steel had not violated § 2 through the acquisition of 180 formerly independent concerns, we may look to those acquisitions as well as to the eight acquisitions from 1924 to 1943 to determine the intent of United States Steel in acquiring Consolidated.

We look not only to those acquisitions, however, but also to the latest acquisition—the government-owned plant at Geneva. We think that last acquisition is of significance in ascertaining the intent of United States Steel in acquiring Consolidated.[32] The bid of United States Steel for the Geneva plant emphasized the importance of erecting finishing facilities to assure a market for Geneva's production, and we think it a fact of weight that many of the other bids were conditioned upon the government lending money or making grants for erecting such facilities at no cost to the bidder. No objection was interposed when United States Steel indicated that it proposed to spend $25,000,000 to erect a cold reduction mill at Pittsburg, and it is doubtful whether objections could be raised if United States Steel proposed to build instead of to buy from a competitor fabricating facilities similar to those possessed by Consolidated. The reasons given by Consolidated and United States Steel for the purchase and sale of the assets here involved seem not to involve

---

[30] *United States* v. *Griffith, supra,* note 24.

[31] *United States* v. *United States Steel Corp.,* 251 U. S. 417.

[32] *Id.,* at 446.

any action condemned by the Sherman Act. Granting that the sale will to some extent affect competition, the acquisition of a firm outlet to absorb a portion of Geneva's rolled steel production seems to reflect a normal business purpose rather than a scheme to circumvent the law. United States Steel, despite its large sales, many acquisitions and leading position in the industry, has declined in the proportion of rolled steel products it manufactures in comparison with its early days. In 1901 it produced 50.1%; in 1911, 45.7%; in 1946, 30.4%.[33] For the period 1937–1946, it produced 33.2%.[34] Its size is impressive. Size has significance also in an appraisal of alleged violations of the Sherman Act. But the steel industry is also of impressive size and the welcome westward extension of that industry requires that the existing companies go into production there or abandon that market to other organizations.

We have dealt with the objections to this purchase because of the exclusion of other rolled steel producers from supplying Consolidated's demand for that product and because of the alleged restraint of trade involved in the extension of United States Steel's fabricating and pipe commerce. It has been necessary to treat these arguments separately so as to isolate the facts and figures which convince us that these objections do not rise to the level of proving a violation of law. It only need be added that we have also considered the various items of objection in the aggregate and in the light of the charge of

[33] The figures for 1901 and 1911 are taken from *United States* v. *United States Steel Corp.*, 223 Fed. 55, 67.

[34] The record includes an unchallenged table showing the proportion of total national production of steel ingots and steel for casting attributable to United States Steel from 1901 through 1946. It is taken from the statistical reports of the American Iron and Steel Institute and United States Steel. It may be summarized by saying it shows an irregular reduction from over 60% to less than 33-1/3%.

intent to monopolize. But even from that point of view, the government has not persuaded us that the proposed contract violates our public policy as stated in the Sherman Act.

The judgment of the District Court is affirmed.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK, MR. JUSTICE MURPHY, and MR. JUSTICE RUTLEDGE concur, dissenting.

This is the most important antitrust case which has been before the Court in years. It is important because it reveals the way of growth of monopoly power—the precise phenomenon at which the Sherman Act was aimed. Here we have the pattern of the evolution of the great trusts. Little, independent units are gobbled up by bigger ones. At times the independent is driven to the wall and surrenders. At other times any number of "sound business reasons" appear why the sale to or merger with the trust should be made.[1] If the acqui-

---

[1] The most frequent reasons given for mergers are that they prevent waste and promote efficiency, reduce overhead, dilute sales and advertising costs, spread risks, etc. Compare, New Mergers, New Motives, Business Week, Nov. 10, 1945, p. 68; Growth of Business Units: Effect of War and Shortages, United States News, May 10, 1946, p. 48. But that these advantages are largely illusory has long been recognized. See, e. g., Relative Efficiency of Large, Medium-sized, and Small Business (TNEC Monograph 13, 1941) pp. 111, 128, 132, 398. The theory was never more forcefully exploded than by Brandeis in The Curse of Bigness:

"The only argument that has been seriously advanced in favor of private monopoly is that competition involves waste, while the monopoly prevents waste and leads to efficiency. This argument is essentially unsound. The wastes of competition are negligible. The economies of monopoly are superficial and delusive. The efficiency of monopoly is at the best temporary.

"Undoubtedly competition involves waste. What human activity does not? The wastes of democracy are among the greatest obvious wastes, but we have compensations in democracy which far outweigh

sition were the result of predatory practices or restraints of trade, the trust could be required to disgorge. *Schine Chain Theatres, Inc.* v. *United States,* 334 U. S. 110. But the impact on future competition and on the economy is the same though the trust was built in more gentlemanly ways.

We have here the problem of bigness. Its lesson should by now have been burned into our memory by Brandeis. *The Curse of Bigness* shows how size can become a menace—both industrial and social. It can be an industrial menace because it creates gross inequalities against existing or putative competitors. It can be a social menace—

---

that waste and make it more efficient than absolutism. So it is with competition. The waste is relatively insignificant. There are wastes of competition which do not develop, but kill. These the law can and should eliminate, by regulating competition.

"It is true that the unit in business may be too small to be efficient. It is also true that the unit may be too large to be efficient, and this is no uncommon incident of monopoly." P. 105.

". . . no monopoly in private industry in America has yet been attained by efficiency alone. No business has been so superior to its competitors in the processes of manufacture or of distribution as to enable it to control the market solely by reason of its superiority." P. 114–15.

"The Steel Trust, while apparently free from the coarser forms of suppressing competition, acquired control of the market not through greater efficiency, but by buying up existing plants and particularly ore supplies at fabulous prices, and by controlling strategic transportation systems." P. 115.

"But the efficiency of monopolies, even if established, would not justify their existence unless the community should reap benefit from the efficiency; experience teaches us that whenever trusts have developed efficiency, their fruits have been absorbed almost wholly by the trusts themselves. From such efficiency as they have developed the community has gained substantially nothing. For instance: . . . *The Steel Trust,* a corporation of reputed efficiency. The high prices maintained by it in the industry are matters of common knowledge. In less than ten years it accumulated for its shareholders or paid out as dividends on stock representing merely water, over $650,000,000." Pp. 120–121.

because of its control of prices.[2]   Control of prices in the steel industry is powerful leverage on our economy. For the price of steel determines the price of hundreds of other articles.   Our price level determines in large measure whether we have prosperity or depression—an economy of abundance or scarcity.   Size in steel should therefore be jealously watched.[3]   In final analysis, size in steel is the measure of the power of a handful of men over our economy.   That power can be utilized with lightning speed.   It can be benign or it can be dangerous. The philosophy of the Sherman Act is that it should not exist.   For all power tends to develop into a government in itself.   Power that controls the economy should be in the hands of elected representatives of the people, not in the hands of an industrial oligarchy.   Industrial power should be decentralized.   It should be scattered into many hands so that the fortunes of the people will not be dependent on the whim or caprice, the political prejudices, the emotional stability of a few self-appointed men.   The fact that they are not vicious men but respectable and social-minded is irrelevant.   That is the philosophy and the command of the Sherman Act.   It is founded on a theory of hostility to the concentration in private hands of power so great that only a government of the people should have it.

The Court forgot this lesson in *United States* v. *United States Steel Corp.*, 251 U. S. 417, and in *United States* v.

---

[2] See Relative Efficiency of Large, Medium-sized, and Small Business (TNEC Monograph 13, 1941) p. 132.

[3] In 1911 when the original antitrust suit against United States Steel was instituted, the company had already absorbed 180 formerly independent concerns.   See *United States* v. *United States Steel Corp.*, 223 F. 55, 162.   Since then it has absorbed at least 8 additional independent companies, including Columbia which prior to 1930 was operated by an independent producer and maintained the only integrated steel operation west of the Rockies.

*International Harvester Co.,* 274 U. S. 693. The Court today forgets it when it allows United States Steel to wrap its tentacles tighter around the steel industry of the West.

This acquisition can be dressed up (perhaps legitimately) in terms of an expansion to meet the demands of a business which is growing as a result of superior and enterprising management.[4] But the test under the Sherman Act strikes deeper. However the acquisition may be rationalized, the effect is plain. It is a purchase for control, a purchase for control of a market for which United States Steel has in the past had to compete but which it no longer wants left to the uncertainties that competition in the West may engender. This in effect it concedes. It states that its purpose in acquiring Consolidated is to insure itself of a market for part of Geneva's production of rolled steel products when demand falls off.

But competition is never more irrevocably eliminated than by buying the customer for whose business the industry has been competing. The business of Consolidated amounts to around $22,000,000 annually. The competitive purchases by Consolidated are over $5,000,000 a year. I do not see how it is possible to say that $5,000,000 of commerce is immaterial. It plainly is not *de minimis.* And it is the character of the restraint which § 1 of the Act brands as illegal, not the amount of commerce affected. *Montague & Co.* v. *Lowry,* 193 U. S. 38; *United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150, 225, n. 59; *United States* v. *Yellow Cab Co.,* 332 U. S. 218, 225. At least it can be said here, as it was in *International Salt Co.* v. *United States,* 332 U. S. 392, 396, that the volume of business restrained by this contract is not insignificant or insubstantial. United States Steel does not consider

---

[4] See note 1, *supra.*

it insignificant, for the aim of this well-conceived project is to monopolize it. If it is not insubstantial as a market for United States Steel, it certainly is not from the point of view of the struggling western units of the steel industry.

It is unrealistic to measure Consolidated's part of the market by determining its proportion of the national market. There is no safeguarding of competition in the theory that the bigger the national market the less protection will be given those selling to the smaller components thereof. That theory would allow a producer to absorb outlets upon which small enterprises with restricted marketing facilities depend. Those outlets, though statistically unimportant from the point of view of the national market, could be a matter of life and death to small, local enterprises.

The largest market which must be taken for comparison is the market actually reached by the company which is being absorbed. In this case Consolidated's purchases of rolled steel products are a little over 3 per cent of that market. By no standard—United States Steel's or its western competitors—can that percentage be deemed immaterial. Yet consideration of the case from that viewpoint puts the public interest phase of the acquisition in the least favorable light. A surer test of the impact of the acquisition on competition is to be determined not only by consideration of the actual markets reached by Consolidated but also by the actual purchases which it makes. Its purchases were predominantly of plates and shapes—76 per cent from 1937–1941. This was in 1937 13 per cent of the total in the Consolidated market. That comparison is rejected by the Court or at least discounted on the theory that competitors presently selling to Consolidated can probably convert from plates and shapes to other forms of rolled steel products. But a surer test of the effect on competition is the actual business of which

competitors will be deprived. We do not know whether they can be sufficiently resourceful to recover from this strengthening of the hold which this giant of the industry now has on their markets. It would be more in keeping with the spirit of the Sherman Act to give the benefits of any doubts to the struggling competitors.

It is, of course, immaterial that a purpose or intent to achieve the result may not have been present. The holding of the cases from *United States* v. *Patten,* 226 U. S. 525, 543, to *United States* v. *Griffith,* 334 U. S. 100, is that the requisite purpose or intent is present if monopoly or restraint of trade results as a direct and necessary consequence of what was done. We need not hold that vertical integration is *per se* unlawful in order to strike down what is accomplished here. The consequence of the deliberate, calculated purchase for purpose of control over this substantial share of the market can no more be avoided here than it was in *United States* v. *Reading Co.,* 253 U. S. 26, 57, and in *United States* v. *Yellow Cab Co., supra.* I do not stop to consider the effect of the acquisition on competition in the sale of fabricated steel products. The monopoly of this substantial market for rolled steel products is in itself an unreasonable restraint of trade under § 1 of the Act.

The result might well be different if Consolidated were merging with or being acquired by an independent West Coast producer for the purpose of developing an integrated operation. The purchase might then be part of an intensely practical plan to put together an independent western unit of the industry with sufficient resources and strength to compete with the giants of the industry. Approval of this acquisition works in precisely the opposite direction. It makes dim the prospects that the western steel industry will be free from the control of the eastern giants. United States Steel, now that it owns the Geneva plant, has over 51 per cent of the rolled steel

540

or ingot capacity of the Pacific Coast area. This acquisition gives it unquestioned domination there and protects it against growth of the independents in that developing region. That alone is sufficient to condemn the purchase. Its serious impact on competition and the economy is emphasized when it is recalled that United States Steel has one-third of the rolled steel production of the entire country.[5] The least I can say is that a company that has that tremendous leverage on our economy is big enough.[6]

---

[5] See note 8 of the Court's opinion.

[6] "United States Steel is the giant of the industry. Its manufacturing capacity is 'greater than that of all German producers combined. It is more than twice that of the entire British steel industry and more than twice that of all the French mills combined.' In addition to its facilities for producing pig iron, steel ingots, and all forms of finished and semifinished steel products, the corporation owned and operated through some 150 subsidiaries, in 1937, nearly 2,000 oil and natural gas wells, 89 iron ore mines, 79 coal mines, some 40 limestone, dolomite, cement rock, and clay quarries, a number of gypsum and fluorspar mines, 2 zinc mines, a manganese ore mine in Brazil, over 5,000 coking ovens, several water-supply systems with reservoirs, filtration plants, and pumping stations, over 100 ocean, lake, and river steamers, 500 barges and tugs, railroads, fire brick plants, and mills producing 12,000,000 barrels of cement. By virtue of its tremendous size and its high degree of integration, the corporation is in a position to dominate the field." Wilcox, Competition and Monopoly in American Industry (TNEC Monograph 21, 1940) p. 120.