**UNITED STATES of America,**
**Plaintiff,**

v.

**The PHILADELPHIA NATIONAL BANK and Girard Trust Corn Exchange Bank, Defendants.**

**Civ. A. No. 29287.**

United States District Court
E. D. Pennsylvania.

Jan. 15, 1962.

George D. Reycraft, James A. Reed, John M. O'Donnell, P. Jay Flocken, Charles A. Degnan, Dept. of Justice, Washington, D. C., Drew J. T. O'Keefe, U. S. Atty., Philadelphia, Pa., for plaintiff.

Arthur Littleton, Philadelphia, Pa., Ernest R. Von Starck, Don B. Blenko, Donald A. Scott, Morgan, Lewis & Bockius, Philadelphia, Pa., of counsel, for defendant, the Philadelphia Nat. Bank.

Philip Price, Philadelphia Pa., Carroll R. Wetzel, Minturn T. Wright, III, John J. Brennan, Barnes, Dechert, Price, Myers & Rhoads, Philadelphia, Pa., of counsel, for defendant, Girard Trust Corn Exchange Bank.

CLARY, Chief Judge.

This is a civil action instituted under Section 4 of the Act of Congress of July 2, 1890, as amended, 15 U.S.C.A. § 4, (commonly known and hereinafter referred to as the "Sherman Antitrust Act"), and Section 15 of the Act of Congress of October 15, 1914, as amended, 15 U.S.C.A. § 25, (commonly referred to and hereinafter designated as the "Clayton Antitrust Act"), in which the United States (hereinafter referred to as "government" or "plaintiff") seeks an injunction to restrain the defendants, The Philadelphia National Bank (hereinafter referred to as "PNB") and Girard Trust Corn Exchange Bank (hereinafter referred to as "Girard"), from carrying out an agreement of consolidation. This agreement of consolidation

was drawn up after the passage of Public Law 86–463, (commonly referred to as "The Bank Merger Act of 1960"), amending 74 Stat. 129, approved May 13, 1960, found at 12 U.S.C.A. § 1828(c), and is subject to the provisions thereof. Plaintiff herein alleges that the proposed consolidation violates Section 1 of the Sherman Antitrust Act, as amended, 15 U.S.C.A. § 1, and Section 7 of the Clayton Antitrust Act, as further amended by the Act of Congress of December 29, 1950, 15 U.S.C.A. § 18, (commonly known as "The Celler-Kefauver Anti-Merger Act").

The proposed merger sought to be enjoined was approved by the Directors of the banks involved on November 15, 1960, and by the Comptroller of the Currency on February 24, 1961. This action was instituted on February 25, 1961.

Generally, the complaint alleges that commercial banking and several of its integral parts comprise interstate commerce; that commercial banking with its integral parts fills an essential and unique role in the nation's economy with a combination of services unduplicated by other financial institutions; that existing and potential competition in commercial banking in the Philadelphia area would be substantially and unreasonably lessened; that the merger would substantially and unreasonably increase concentration in banking in the Philadelphia area and that existing and potential competition in the commerce and industry served by commercial banks in the Philadelphia area would be substantially and unreasonably lessened. Parenthetically it may be noted at the outset that the last of these averments has not been seriously presented by the plaintiff and, for all practical purposes, has been abandoned.

The net effect of the above, the plaintiff contends, is a violation of both Section 1 of the Sherman Act and Section 7 of the Clayton Act. The plaintiff contends further that competition in commercial banking is absolutely vital and necessary to the preservation of the financial structure and security of the nation; that undue concentration of banking powers would have the effect of increasing costs and interests rates both to depositors and borrowers; would result in a decrease in the credit facilities available to the general public and, in effect, would destroy the very foundation of the banking system of the United States which, according to the Government's witnesses, rests entirely upon a number of independently-owned banks serving the community, which system they felt strengthened competition, and a merger such as this would tend to destroy it.

Initially, it would help to review, in extremely brief outline, what Congress has done in this field. The Sherman Act, supra, enacted in 1890, was designed to prevent combinations in restraint of trade or commerce among the several states or with foreign nations. That this was an exposition of the common law doctrine is revealed by the decision in United States v. American Tobacco Company, 221 U.S. 106, at pages 179–180, 31 S.Ct. 632, at page 648, (1911) where the Supreme Court of the United States declared:

"Applying the rule of reason to the construction of the statute, it was held in the Standard Oil Case that, as the words 'restraint of trade' at common law and in the law of this country at the time of the adoption of the anti-trust act only embraced acts or contracts or agreements or combinations which operated to the prejudice of the public interests by unduly restricting competition, or unduly obstructing the due course of trade, or which, either because of their inherent nature or effect, or because of the evident purpose of the acts, etc., injuriously restrained trade, that the words as used in the statute were designed to have and did have but a like significance. * * * the words 'restraint of trade' should be given a meaning which would not destroy the

individual right to contract, and render difficult, if not impossible, any movement of trade in the channels of interstate commerce,—the free movement of which it was the purpose of the statute to protect." Citing Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911).

■ It will therefore be seen that the Supreme Court judged the key factor and purpose of the Sherman Antitrust law to be the perpetuation of and protection of free competition. An examination of both the Clayton Act and the Federal Trade Commission Act, both passed in the year 1914, and the case law decided thereunder, again stresses the principle of law that competition should be encouraged as a national policy, and it is the destruction of this free competition which is proscribed.

■ The Miller-Tydings Amendment to the Clayton Act and the Robinson-Patman Amendment were both designed to insure free and fair competition. The Celler-Kefauver Amendment of 1950 was designed to prevent asset acquisitions thereby plugging a loophole in the Clayton Act which previously prevented stock acquisition only, and did not cover the area in which asset acquisitions might tend to destroy competition. The legislative history of this latter Act clearly indicates the intent of the Congress to preserve competition as defined by the Supreme Court.

Since competition and the preservation of competition permeates each of the aforementioned Acts and is the common bond between each of them, it would appear that 71 years after the passage of the first Antitrust law, the Court should have (but does not) a clear legal definition of competition as used in each of the Acts. Congress has given the Court at least one idea of what it means in the use of the word when it refers to "vigorous" competition. What then is the real definition of competition and what are the standards of competition required by these Acts? The Webster definition reads as follows:

"Com. & Econ. The effort of two or more parties, acting independently, to secure the custom of a third party by the offer of the most favorable terms; also, the relations between different buyers or different sellers which result from this effort."

In United States v. Aluminum Company of America, 91 F.Supp. 333, at 355 (S.D.N.Y.1950), Chief Judge Knox defined competition as follows:

"Commercial competition, theoretically, is the independent endeavor of two or more persons or organizations within the realm of a chosen market place, to obtain the business patronage of others by means of various appeals, including the offer of more attractive terms or superior merchandise."

■ It seems to the Court that the Congress, by the use of the word "competition", intended to preserve free and open markets wherein the rivalry of the commercial firms, in the same line of endeavor, for the patronage of the common customer, would be demonstrated by a business atmosphere where free purchasers and free sellers, under no obligation to buy, and under no obligation to sell, would enter into contracts of purchase and sales (or service contracts) because of the actual inducements offered, such as quality of product, terms, delivery and the many other factors which make for good business relations, having in mind the peculiar situations, facts and circumstances which govern the particular transactions between individuals or organizations.

■ It is also apparent that in any antitrust action, including the instant one, a Judge called upon to decide the case must, of necessity, take the facts that are presented to him and determine on those peculiar facts whether the particular circumstances involved will, or will not, destroy the free competition which the Congress intended to pre-

serve, and with particular scrutiny of the industry or part thereof charged with violations.

The Government here has brought an action—the first of its kind—to prevent the merger of two strong Philadelphia banks, and on the ground that this merger will (1) violate the Sherman Act by restraining trade, and (2) violate the Clayton Act by lessening and/or destroying competition and tending toward a monopoly. The Court believes that the Government's general theory of the case should be set out in brief, broad outline before coming to the specifics.

The Government's case was predicated upon the premise that the banks involved were legally restricted to having offices in geographic limits. Starting with that assumption, the Government introduced a wealth of statistical data, the accuracy of which has not been questioned, which would show that a very large percentage of the deposits and loans originated in the restricted geographical area. Based strictly upon this premise, and applying the principles heretofore enunciated in industrial cases, the Government argues that these percentages are all persuasive, show a high degree of concentration of the market involved, and that it is therefore the duty of the Court to prevent this clear, apparent restraint of trade, destruction of, or restriction of competition, and tendency to monopoly by prohibiting the merger.

The Court accepts the statistics introduced as showing exactly what they demonstrate on the figures used, but, as will be pointed out later when discussing the specifics, refuses to accept the conclusions which the Government asks the Court to draw.

In support of its contention that this merger is illegal, the Government attempted to show by the testimony of two university professors that the merger would have a profound adverse effect upon the banking system of this area, actually restrict credit, and permit price fixing for banking services. This at-tempt was far from successful. The professors had individual theories of the effect of the merger on the monetary system of the United States and of this area, which were completely destroyed on cross-examination, particularly as relating to the Philadelphia situation. The Government also attempted to establish, by opinion testimony of small town bankers, that the contemplated merger would adversely affect not only the banking situation in Philadelphia, but generally throughout the country, including their own small towns. Their testimony was practically a rehash of the testimony they gave before both the House and Senate Committees considering the Bank Merger Act of 1960. There they strongly urged the Congress of the United States to forbid further bank mergers and to maintain the status quo of the banking system of the United States. They attempted to have Congress limit prospective mergers to the very narrow situations where economic necessity would make a merger absolutely imperative. For example, they conceded that where a bank was on the verge of insolvency, a merger should be permitted with a strong solvent bank for the protection of depositors and the general public. They also agreed that where ineffectual management was demonstrated, again it would be in the public interest to merge the bank with a strong progressive bank, again for protection of depositors and the public. With these two and other minor exceptions, not necessary to outline here, they fought vigorously to have the Congress absolutely forbid all other mergers. This the Congress refused to do, and, in the opinion of this Court, properly so.

Commercial banking, despite the attempt of the Government in this case to have the Court consider it an ordinary line of commercial endeavor, comparable to the ordinary industrial organizations, is a specialized branch of what the Court chooses to term the financial industry. It is completely regulated. It may not, as an industrial plant might, establish a branch of op-

erations where it pleases. By virtue of both state and federal authority, it must keep its assets liquid, as will be hereinafter discussed. It may charge for its principal services (lending of money) a maximum prescribed by law. It may not pay interest on demand deposits and is limited by law to the amounts which it may pay for savings or time deposits. It may not go out and buy raw materials and manufacture products and attempt to extend its market. Its stock in trade is money and the only way that it can generate its stock in trade—money—is to create demand deposits which it may lend to individuals, corporations or organizations. It is the commercial bank, even though strictly regulated, which comprises the backbone of the monetary system of the United States. To place it in and consider it as part of the commercial and industrial field, as contrasted with the financial, would be to ignore the realities of the situation.

Both the Government and the defendants have, in support of their respective contentions, cited the only antitrust case law available and all such cases were decided under the Sherman and subsequent Acts. All involve only commercial and industrial organizations. While the Court recognizes the validity of the broad principles of law therein enunciated, it certainly does not follow that those principles should be applied with the same force and effect to a regulated industry as to one in the so-called "free enterprise" field. The Congress of the United States has, in fact, in the industrial and commercial field, usually exempted regulated industries from the application of the antitrust law and in the public interest.

It is significant to note that in the Bank Merger Act, the Congress of the United States has included as one of the controlling elements, and an important one, for consideration in the determination of Governmental approval of bank mergers, that same public interest. This Court does not believe, as the Government would have it, that this was a mere passing reference without practical significance and actually completely irrelevant to a decision of this case, but, on the contrary, feels that the inclusion of this public interest concept is an important element in the Congressional approach to monetary regulation.

■ The only question involved in this case is—Will this proposed merger of two Philadelphia banks, in the City and County of Philadelphia, Commonwealth of Pennsylvania, substantially lessen competition, tend toward monopoly, and/or restrain trade and commerce, in violation of the Clayton and Sherman Acts?

Coming now to the specifics of this case and expanding upon the allegations of the complaint, it avers, inter alia, that commercial banks fill an essential and unique role in the nation's economy with a combination of services unduplicated by other financial institutions; that commercial banking in Philadelphia and the surrounding metropolitan area is heavily concentrated in a few banks; that PNB and Girard compete with each other, and with other banks in the Philadelphia area, in the performance of commercial banking functions; that as of June 30, 1960, PNB accounted for approximately 22% and Girard for approximately 15% of the total deposits in Philadelphia commercial banks; and, that as a result of the proposed merger PNB would become the largest commercial bank in the Philadelphia area and would be approximately 50% larger than its closest competitor.

Further, it is charged that defendants have been engaged in an unlawful combination in unreasonable restraint of trade and commerce in commercial banking in violation of Section 1 of the Sherman Act, and that the effect of the merger may be substantially to lessen competition, or tend to create a monopoly in violation of Section 7 of the Clayton Act.

PNB is a banking association, engaged in interstate commerce, organized under the laws of the United States, having its principal place of business at

Philadelphia, Pennsylvania. Girard is a banking association, engaged in interstate commerce organized under the laws of the Commonwealth of Pennsylvania, having its principal place of business at Philadelphia, Pennsylvania.

On November 15, 1960 the Boards of Directors of PNB and Girard approved a proposed merger of the two banks. On the same day, an application for approval of the merger was filed with the Comptroller of the Currency in accordance with the provisions of the 1960 amendment to the Federal Deposit Insurance Corporation Act, 12 U.S.C.A. § 1828(c), commonly known as the Bank Merger Act.

On December 20, 1960, the two Boards approved a written agreement of consolidation to be effected in accordance with the provisions of the national banking statutes, 12 U.S.C.A. § 215. On February 24, 1961 the Comptroller of the Currency approved the proposed merger. He did so despite the fact that in the reports submitted to the Comptroller by the Federal Reserve Board, the Federal Deposit Insurance Corporation and the Attorney General, as was required by the Bank Merger Act, both the Attorney General and the Federal Reserve Board concluded that the merger would result in a substantial lessening of competition and a tendency toward monopoly, and the Federal Deposit Insurance Corporation concluded that the merger would be adverse as to Philadelphia and the immediate suburbs, but not adverse in the regional, national, and international fields of competition.

The next day the Department of Justice filed the complaint in this action. On May 9, 1961, meetings of the shareholders of the two banks were held and the agreement of consolidation was approved. The trial of this case began on June 5, 1961, without a jury, and was concluded on August 3, 1961.

PNB was chartered on October 20, 1864 under an Act of Congress of June 3, 1864. In 1926 it merged with Girard National Bank, and in 1928 it merged with Franklin-Fourth Street National Bank. Until 1951 PNB engaged in what has been termed a "wholesale" banking business, at which time it was decided to enter the "retail" banking and trust fields. Since 1951 PNB has acquired 9 additional banks. As of March 10, 1961, PNB conducted a general commercial banking business through 27 offices, 10 of which are located in Philadelphia County, 5 in Delaware County, 5 in Bucks County, and 7 in Montgomery County. As of June 30, 1960, PNB had total assets of $1,064,335,000, total deposits of $924,495,000, and total loans of $523,612,316 of which approximately 57% in dollar amount were in commercial and industrial loans.

Girard was chartered as a state bank on March 17, 1836 by the Pennsylvania legislature. It was primarily engaged in the trust business and accompanying banking services until 1940 at which time efforts were begun to develop commercial business and consumer credit loans. Until 1950 Girard had only one office. In the past 10 years it has engaged in 6 mergers. Girard now conducts a general commercial banking business through 39 offices, of which 21 are located in Philadelphia, 12 in Delaware County, and 6 in Montgomery County. As of June 30, 1960 Girard had total net assets of $740,920,000, total net deposits of $650,790,000 and total net loans of $399,362,000, of which approximately 49% in dollar amount were in the commercial and industrial category.

With this brief introduction it now becomes necessary, before discussing in detail the factual questions presented and the law applicable thereto, to decide two purely legal questions which have been raised, one relating to the Bank Merger Act, the other to the applicability of the Clayton Act to this action.

### Bank Merger Act of 1960.

The defendants contend that the approval of the merger by the Comptroller of the Currency is the final and exclusive determination of its legality and that the Bank Merger Act of 1960

precludes a review of the proposed merger under the antitrust laws. 12 U.S.C. A. § 1828(c) reads in relevant part:

"No insured bank shall merge or consolidate with any other insured bank or, either directly or indirectly, acquire the assets of, or assume liability to pay any deposits made in, any other insured bank without the prior written consent (i) of the Comptroller of the Currency if the acquiring, assuming, or resulting bank is to be a national bank or a District bank, * * *. In granting or withholding consent under this subsection, the Comptroller, * * * shall consider the financial history and condition of each of the banks involved, the adequacy of its capital structure, its future earnings prospects, the general character of its management, the convenience and needs of the community to be served, and whether or not its corporate powers are consistent with the purposes of this chapter. In the case of a merger, consolidation, acquisition of assets, or assumption of liabilities, the appropriate agency shall also take into consideration the effect of the transaction on competition (including any tendency toward monopoly), and shall not approve the transaction unless, after considering all of such factors, it finds the transaction to be in the public interest."

Defendants claim that the above statute makes it clear that it was the intent of Congress that the Comptroller test the validity of bank mergers by a *public interest* standard which is broader than and essentially different from an exclusively antitrust standard. Since Congress decided to apply antitrust policies to such mergers only to the limited and subordinate extent of being a single factor for consideration, it is argued, it must follow that the practical implementation of this congressional decision necessarily precludes an antitrust action to prevent a merger which has been approved by the executive agency charged with applying the public interest standard in determining whether approval should be given.

In support of this argument, it is submitted that the legislative history of the Bank Merger Act (hereinafter referred to as the "Act"), emphasizes the fact that the competitive factors are not to be controlling in the public interest determination to be made by the Comptroller. For example, at page 24 of the Senate Report, Senate Report No. 196, 86th Cong., 1st Sess. on S. 1062 (1959), the following statement appears:

"Under S. 1062 the competitive factors involved in the merger are only one element of several to be considered in passing on the application. The committee wants to make crystal clear its intention that the various banking factors in any particular case may be held to outweigh the competitive factors, and that the competitive factors, however favorable or unfavorable, are not, in and of themselves, controlling on the decision."

And, in the House Report at pages 9 and 10, House Report No. 1416, 86th Cong. 2d Sess., (1960), this statement appears:

"Because banking is a licensed and strictly supervised industry that offers problems acutely different from other types of business, the bill vests the ultimate authority to pass on mergers in the Federal bank supervisory agencies, which have a thorough knowledge of the banks, their personnel, and their types of business." U.S.Code Congressional and Administrative News 1960, p. 1995.

It is true that one can find statements in the legislative history of the Act which, when read alone, indicate that Congress intended to preclude the application of the antitrust laws to bank mergers. It is most difficult, however, to accept defendants' contention when faced with unequivocal statements to the contrary in the reports of both the Senate and the House. This statement appears at page 9 of the House Report:

"S. 1062 would not in any way affect the applicability of the Sherman Act or the Clayton Act to bank mergers."

And, at page 3 of the Senate Report:

"S. 1062 would not affect in any way the applicability of the Sherman Act to bank mergers and consolidations."

These statements cannot possibly be reconciled with defendants' interpretation of the legislative intent of Congress.

In support of their position, the defendants place a great deal of weight on the *public interest,* as opposed to the antitrust, standard written into the Act. Why, they ask, would Congress arm the Comptroller with such a comprehensive standard if it intended that the Department of Justice could supersede his determination by a mere showing of anti-competitive effects? This argument of the defendants, while persuasive, does not convince the Court that it should enunciate the rule of law requested that public interest is the controlling factor in any particular merger. There is no doubt that the public interest factor, while not controlling, does, in this type of antitrust litigation, play more than a casual or secondary role, particularly where it involves a highly regulated field. The Court cannot conclude that merely because a public interest standard was written in the statute as one of the factors to be considered, that a Court is rendered incompetent to review the action of the individual or department charged with the administration of the Act. Had Congress so intended, it certainly would have been specifically set out and in plain terms in the language of the statute. The Court does not find that intendment here.

Defendants also press the argument on another ground as well. They say that Congress intended to exclude the antitrust laws because the Act contains no provision such as is found in Section 11 of the Bank Holding Company Act of 1956, 12 U.S.C.A. § 1841 et seq., which explicitly preserves the application of the antitrust laws to the subject matter of the statute. It is pointed out that Congressman Celler proposed specific language for such an amendment in the House hearings on the bill, but nevertheless it was not included in the amendment by the House of Senate 1062 as previously passed by the Senate. The following statement, however, clearly indicates that Congressman Celler did not consider that the antitrust laws would be excluded by the failure to insert such a provision:

"While such a provision would not add to the bill from a substantive standpoint, it would avoid needless controversy and possible litigation involving the contention that the strictures of the Sherman and Clayton Acts had been nullified by the provisions of the pending bill." Hearings before the Subcommittee No. 2 of the Committee on Banking and Currency, H.R., 86th Cong., 2d Sess. on S. 1062 (1960), pages 131 and 132.

Moreover, the Court finds the antithetical argument proffered by the plaintiff equally, if not more persuasive, than that of the defendants. The Government argues that a creation of an exemption from the antitrust laws requires clear and explicit language in the exempting statute such as is found in Section 5(11) of the Interstate Commerce Act, 49 U.S.C.A. § 5(11).

In light of this difference of opinion, the Court is constrained to return to the statements made in both the Senate and House reports concerning the applicability of the Clayton and Sherman Acts. It is the opinion of this Court that defendants have failed in their attempt to nullify the plain meaning of these words. They are much too explicit to be ignored or explained away.

Applicability of Section 7
of Clayton Act.

The Celler-Kefauver Anti-Merger Act, 15 U.S.C.A. § 18, reads in relevant part:

"No corporation engaged in commerce shall acquire, directly or indi-

rectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

The Celler-Kefauver amendment was enacted in 1950 as the original Section 7 proved ineffective in preventing mergers, primarily because of the failure of the statute to include asset as well as stock acquisitions. Because banks are exempted from the jurisdiction of the Federal Trade Commission, under the provisions of the Federal Trade Commission Act, 15 U.S.C.A. § 45(a), the Celler-Kefauver amendment can only apply if the bank merger is consummated through a stock acquisition. Therefore, if the Clayton Act is to apply at all to the merger presently under consideration, the plaintiff must show that the proposed consolidation of the defendants involves a stock acquisition.

Before considering the argument advanced by the plaintiff with respect to this question, it is necessary, so that the transaction can be placed in the proper perspective, to set forth certain pertinent provisions of the agreement of consolidation entered into by the defendant banks:

### Section 1.

"Girard and Philadelphia National (the 'Consolidating Banks') shall be consolidated, pursuant to the provisions of the aforesaid statute,[1] under the charter of the Philadelphia National Bank, which shall continue after the effective date of the consolidation as defined below."

### Section 5.

"The corporate existence of Girard shall be merged into and continued in Philadelphia National, which shall continue in existence as the Association, and the Association shall be deemed to be the same corporation as each of the Consolidating Banks. All rights, franchises, and interests of each bank in, and to every type of property and choses in action, including those held by it as fiduciary, as they exist at the Effective Date shall be vested in the Association without any conveyance or transfer; and the Association shall be responsible for all of the liabilities of every kind and description, including liabilities arising out of the operation of the Trust Department, of each bank existing as of the Effective Date."

"Girard shall contribute to the Association acceptable assets having a book value, over and above its liability to its creditors, of at least $74,059,392 * * *"

"At the Effective Date Philadelphia National shall have on hand acceptable assets having a book value, over and above its liability to its creditors, of at least $93,306,684 * * *"

### Section 6.

"Upon the statutory consolidation becoming effective: * * * (i) each holder of an outstanding certificate representing shares of Philadelphia National stock shall retain his certificate, which shall automatically remain a certificate representing shares of stock in the Association, * * * and (ii) each holder of an outstanding certificate representing shares of Girard stock shall surrender the same to the Association promptly after the Effective Date and receive in exchange therefor certificates representing the full number of whole shares of stock in the Association to which such shares of stock in Girard shall have been converted, * * *"

---

1. 12 U.S.C.A. § 215.

The plaintiff contends that under the provisions of Section 6 of the agreement, PNB shall acquire shares of Girard stock which shall be converted into shares of stock in the Association. It is argued that as a result of the merger, the Girard shareholders would give up certain rights (e. g., the right to have a voice in its management, the right to share in its profits, and the right to receive and divide its total capital less debt upon liquidation) to PNB and receive in exchange an equitable ownership in the very different property of PNB. From this it is concluded that the merger would be accomplished by a stock acquisition on the part of PNB in violation of the Celler-Kefauver amendment to Section 7 of the Clayton Act. The Court cannot agree with the plaintiff's conclusion that the transaction here involved is a stock acquisition falling within the scope of the statute.

Plaintiff has misinterpreted the terms of the agreement. Under the provisions of Section 5, the corporate existence of Girard is being merged with that of PNB to form an Association, each bank contributing all its assets. It is true that the Association being created will continue under the national bank charter already held by PNB. However, this in no way alters the fact that the corporate character of PNB, as it is today, will cease to exist. PNB might be designated the "surviving bank" but it nevertheless survives as a vastly different entity. PNB is acquiring nothing. Rather, the two banks are creating a national banking association by the consolidation of their assets. Section 6 merely outlines the procedures to be followed with respect to the shareholder's evidence of ownership in the Association once the consolidation becomes a reality. The Association itself is exchanging the certificates representing shares of Girard stock for certificates representing shares of stock in the Association. The entire transaction is patterned in conformity with the applicable federal statute relating to bank consolidations and mergers of assets. The fact that certificates representing shares of stock are exchanged for new ones is merely incidental to the transaction, and in no way affects or alters its character.

As defendants point up in their brief, the proposed merger differs from a stock acquisition in several ways under the provisions of the applicable federal statute. 12 U.S.C.A. § 215, which must be adhered to in carrying out the consolidation, provides that it may be effected upon the affirmative vote of at least two-thirds of the capital stock outstanding. In a stock acquisition, there would be no power in Girard, or any group of shareholders, to compel any shareholder to sell his stock. Subsections (b), (c) and (d) of Section 215 provide for the right of a dissenting shareholder to receive the appraised value of his shares in cash; he would not have any comparable right in an acquisition of stock. Subsection (e) of the same statute provides that all of the assets of the individual banks "shall be transferred to and vested in the consolidated national banking association by virtue of such consolidation without any deed or other transfer," which again differs from the procedure with respect to an acquisition of stock.

Moreover, the House Committee on Banking and Currency, when reporting on the Bank Merger Act of 1960, recognized the very problem with which we are confronted here:

"Section 7 of the Clayton Act prohibits acquisitions of bank stock 'where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.' Because Section 7 is limited, insofar as banks are concerned, to cases where a merger is accomplished through acquisition of stock, and because bank mergers are accomplished by asset acquisitions rather than stock acquisitions, the act offers 'little help' in the words of Hon. Robert A. Bicks, acting head of the Antitrust Division, in controlling bank

mergers." House Report No. 1416, 86th Cong., 2d Sess., (1960), p. 9.

This Court is of the opinion that the Celler-Kefauver Anti-Merger Act of 1950 does not apply to a bank merger of this nature. Any extension of the statute is a function peculiar to the Congress of the United States.

However, it should be noted here that because it is essential to the parties that a final determination of this matter be reached in as short a period of time as is possible, this Court will proceed on the assumption that the Clayton Act is applicable in all respects.

### Commercial Banking.

Before discussing the questions involved with respect to the Clayton and Sherman Acts, it is necessary to point up the principal characteristics and functions of a commercial bank.

A "commercial bank," as distinguished from other bank and non-bank financial institutions, is an institution authorized to receive both demand and time deposits, to make loans of various types, to engage in trust services and other fiduciary functions, to issue letters of credit, to accept and pay drafts, to rent safety deposit boxes, and to engage in many similar activities. Commercial banks are the only institutions authorized to receive demand deposits. "Demand deposits" are funds accepted by a bank which are subject to immediate withdrawal. They represent the largest element in the money supply of the United States. No interest is paid on demand deposits, as is the case with time and savings deposits.

Commercial banks offer a wider variety of services than any other financial institution. They have been termed the "department stores of finance." Some of their major functions include the receiving of demand deposits, the lending of funds to individuals, partnerships and corporations, the receiving and administering of time and savings deposits, and the performance of personal trust services.

Because commercial banks are the principal reservoir of other people's money, they are regulated to a relatively high degree. Aside from state banking authorities, they may be subject to the jurisdiction of the Federal Reserve Board, the Federal Deposit Insurance Corporation and the Comptroller of the Currency. This governmental regulation necessarily limits to an extreme degree the scope and character of competition among commercial banks.

Demand deposits held by commercial banks account for approximately 80% of the money supply of the United States. For the commercial banking system as a whole, two-thirds of total deposits are demand in nature. In June of 1960, more than 83% of the total deposits of PNB and Girard combined were in the form of demand deposits.

In addition to demand deposits, the area of commercial and industrial loans is one in which great emphasis is placed. Because of this concentration in demand deposits on the part of commercial banks, these commercial and industrial loans are necessarily short term in nature. As has been pointed out previously, PNB, as of June 30, 1960, had approximately 57% in dollar amount of its total loans in the commercial and industrial area, and Girard had approximately 49% in dollar amount of its loans in this same category.

Small and medium size borrowers rely to a great extent on commercial banks to meet their financial needs. In fact, a substantial proportion of loans made in the United States are made to smaller size businesses. In 1955, for example, out of a total of 1,103,000 loans made by member banks of the Federal Reserve, 918,000 were made to businesses with total assets under $250,000. It was testified at the trial of this case that a Philadelphia businessman would find it very difficult to procure an unsecured, short-term loan from any source other than a commercial bank.

Commercial banks are restricted in the nature, amount, volume and purpose of

loans they are permitted to make. All national banks and banks chartered in Pennsylvania and most other states are, in general, not permitted to have outstanding loans to any one customer in an amount in excess of 10% of their capital and surplus. This is what is known as the "lending limit." In addition, those commercial banks which are members of the Federal Reserve must maintain on deposit with the Federal Reserve Bank, or in currency in their own bank, reserves equal to 16.5% of their total demand deposits if they are located in certain areas (including Philadelphia), and 12% if they are so-called country banks. The principal factors in competition among commercial banks are convenience, quality of service, personal relationships, and the capacity to meet the requirements of the customer. The foregoing remarks are not intended to present a comprehensive analysis of commercial banking but all bear on the problem of whether or not the proposed merger violates the statutes.

 The initial problem in litigation of this nature, in either a Sherman Act or Clayton Act case, involves a determination of the relevant market within which the defendants compete. United States v. E. I. Du Pont De Nemours & Co., 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed. 2d 1057 (1957); United States v. Columbia Steel Co., 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948). To find this area of effective competition, the plaintiff must establish a product market (line of commerce) and a geographic market (section of the country).

### The Product Market.

The plaintiff contends that the appropriate lines of commerce in which to gauge the effects of this proposed merger under Section 7 of the Clayton Act are the following: Commercial banking, commercial and industrial loans, installment lending to individuals, single payment loans to individuals, real estate loans, personal trusts, time deposits of partnerships and corporations, time and savings deposits, demand deposits, and IPC (Individual, Partnership and Corporation) demand deposits.

At the outset, the Court is confronted with the problem of deciding which test to apply in determining the appropriate line or lines of commerce. The plaintiff contends that the relevant legal standard for delineating the lines of commerce in which a merger may substantially lessen competition or tend to create a monopoly is whether the products (services) "have sufficient peculiar characteristics and uses to constitute them products sufficiently distinct from all others * * *" This was the test applied in United States v. E. I. Du Pont De Nemours, 353 U.S. 586, pp. 593–594, 77 S.Ct. 872 (1957). The plaintiff argues that the record in this case shows that the general services, as well as certain specialized services, of commercial banks are either not supplied at all or at best supplied only peripherally and imperfectly by other sources.

The defendants suggest another test. They claim that the proper legal standard to be applied in defining the product market is to determine whether the products are "reasonably interchangeable for the purposes for which (they) are produced —price, use and qualities considered." The Supreme Court utilized this test in the so-called Cellophane case. United States v. E. I. Du Pont De Nemours, 351 U.S. 377, 404, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). Defendants contend that commercial banking in its entirety is not a product line. Rather, they submit it is a business which has two major subdivisions—the acceptance of deposits in which the bank is the debtor, and the making of loans in which the bank is the creditor. Both of these major divisions are further divided by distinct types of deposits and loans. As to many of these functions, there are different types of customers, different market areas, and, most importantly different types of competitors and competition. With the possible exception of demand deposits, there is an identical or effective substitute for each one of the services which a commercial bank offers. From this the Court

is to conclude that because the services offered by other financial institutions are reasonably interchangeable with those offered by commercial banks, the separate lines of commerce suggested by the plaintiff cannot be limited merely to commercial banks, but must include in each and every case the services of other financial institutions as well.

Despite the fact that the rule suggested by the plaintiff was enunciated in litigation involving the Clayton Act, while the other was formulated in a Sherman Act case, and recognizing that the parties here imply that the standards are not consistent, it is nevertheless the opinion of this Court that they are nothing more than expressions of the same rule in different language. As Judge Herlands stated in United States v. Columbia Pictures Corp., 189 F.Supp. 153, pp. 183–184 (S.D.N.Y.1960).

"To determine whether or not there is a reasonable probability of a substantial lessening of competition, Section 7 of the Clayton Act demands an examination into economic realities. All competition must be considered, including competition faced by the product in question from other products.

"The tests enunciated by the authorities are consistent. Effectively, the test 'reasonable interchangeability for the purposes for which (the products) are produced—price, use and qualities considered', and the test 'sufficient peculiar characteristics and uses to constitute them products sufficiently distinct * * * to make them a line of commerce within the meaning of the Clayton Act' are but different verbalizations of the same criterion.

"They require the same accumulation and scrutiny of facts and application of judgment. The task is to find the area of effective competition. The 'characteristics and uses' formulation does not limit the court's inquiry to physical attributes and foreclose inquiry into, the competitive situation."

For example, applying this reasoning to the instant case, if a commercial bank has sufficient peculiar characteristics and uses to constitute it sufficiently distinct from all other financial institutions, then a commercial bank cannot reasonably be interchanged with other financial institutions by the individual or business firm. Conversely, if a commercial bank can reasonably be interchanged, then its characteristics and uses must not have those sufficient peculiar characteristics and uses necessary to constitute it sufficiently distinct from other financial institutions.

In attempting to justify its choice of "lines," the plaintiff has endeavored to describe the uniqueness of each one. The defendants have challenged this approach by showing that many other institutions offer very similar services. Thus, plaintiff asserts that only a commercial bank makes unsecured, short-term commercial and industrial loans, while the defendants argue that insurance companies, factors and finance companies make commercial and industrial loans.

Defendants attack the suggested line "installment loans to individuals" on the ground that mutual savings banks, savings and loan associations, credit unions, finance companies, as well as other institutions, all engage in installment lending. Therefore, they argue, it is impossible to gauge the effect that the merger would have without knowing not only the percentage figures for PNB and Girard but also the percentage figures for all these other institutions. This reasoning is used in denouncing almost all of the suggested lines.

It is argued that insurance companies are in direct competition with commercial banks in the making of single payment loans to individuals. And, PNB and Girard contend that several other institutions make real estate loans; that individuals are in direct competition with commercial banks in the personal trust field; that time deposits of partnerships and corporations face competition from many alternatives, including United States Government obligations, commercial paper, tax-free securities, and

banker's acceptances; that savings deposits are not an appropriate line because many other institutions receive savings funds.

Finally, plaintiff claims that demand deposits and IPC demand deposits are a separate product line because only commercial banks are authorized to receive them.

▪ It seems quite apparent that both plaintiff's and defendants' positions have some merit. However, it is not the intention of this Court to subdivide a commercial bank into certain selected services and functions. An approach such as this, carried to the logical extreme, would result in many additional so-called lines of commerce. It is the conglomeration of all the various services and functions that sets the commercial bank off from other financial institutions. Each item is an integral part of the whole, almost every one of which is dependent upon and would not exist but for the other. The Court can perceive no useful purpose here in going any further than designating commercial banking a separate and distinct line of commerce within the meaning of the statute. It is undoubtedly true that some services of a commercial bank overlap, to some degree, with those of certain other institutions. Nevertheless, the Court feels quite confident in holding that commercial banking, viewed collectively, has sufficient peculiar characteristics which negate reasonable interchangeability.

### Section of the Country.

The plaintiff contends that the relevant geographic area for each line of commerce in which to gauge the impact of the proposed merger on competition is the four-county area (Philadelphia, Montgomery, Bucks and Delaware Counties). Under Pennsylvania banking laws, commercial banks may open offices in the political community where their main office is situated, in some other political community within their home county, or in any county contiguous to the county in which the main office is located. At the present time, PNB has offices in Philadelphia and the three contiguous counties of Bucks, Montgomery and Delaware. Girard has offices in Philadelphia, Montgomery and Delaware counties. Plaintiff submits that the phrase "section of the country" in Section 7 must be determined with respect to buyers and sellers. Recognizing that it is as unlikely that any given group of sellers would have all their sales within any specific area, as it is that potential customers in such an area would buy from them to the exclusion of all others, plaintiff argues that the antitrust laws are satisfied if buyers and sellers in a distinguishable area are significantly limited to that area.

The defendants suggest that the plaintiff has proposed the four-county area in order to inflate the percentage figures. They contend that a relevant geographic market for banking services must take into consideration not only the location of the bank and the location of its customers, but also the different types of customers and the location of alternative choices available to them.

Plaintiff has presented a multitude of statistical information showing the source of the defendants' business, which the Court will not reiterate here. A few examples should be sufficient. As of September, 1960, combining the figures for the two banks, commercial and industrial loans outstanding in the four-county area amounted to 57% of the total dollar amount; loans to individuals in the four-county area amounted to 72% of the total dollar amount; lines of credit outstanding amounted to 49% of the total dollar amount; personal trusts originating within the four-county area amounted to 83.1% of the total; and, demand deposits originating within the four-county area amounted to 75.4% of the total dollar amount.

Notwithstanding the fact that some of these percentage figures, at first blush, appear to be substantial, it is the opinion of the Court that the plaintiff has failed to establish that the four-county area is

the appropriate section of the country in which to test the legality of the merger.

Commercial bank markets are extremely complex. It is difficult to pin point a specific locale as the relevant geographic market. PNB and Girard compete in the international, national, regional, as well as the local, markets depending upon the particular service and the customer involved.

In addition, the relevant geographic market is a bilateral concept. Not only must the Court consider the origin of the bank's business, but equally as important are the alternatives available to the customer. Borrowers are not limited by political boundaries, although the smaller ones are limited in range. The alternatives available necessarily depend on the size and financial condition of the customer.

The larger customers definitely have alternatives ranging from regional to national. It was very surprising to learn at the trial of this case that not only New York banks solicit and receive substantial business from customers within the four-county area, but also large banks from all the larger cities in the nation do likewise. Further, the Court is satisfied that PNB and Girard derive a substantial amount of business from without the four-county area.

What then is the "section of the country"? At the very least, it must include the entire Delaware Valley (i. e. Philadelphia, Bucks, Montgomery, Delaware, Chester, Camden, Burlington and Gloucester counties, the last three being in New Jersey), or the ten-county area referred to by the defendants and definitely New York City. However, it probably would be more accurate to state that the relevant geographic market in which PNB and Girard compete includes the greater part of the northeastern United States.

Unfortunately, the Court does not have comparative figures on the relative size of the defendant banks' business in these areas as contrasted with local banks.

Plaintiff has confined its proof almost solely to the four-county area. For this reason, the Court could terminate its discussion of the Clayton Act at this point. The legality of a merger cannot be tested without a relevant market. However, the Court will assume, although it holds otherwise, for the remainder of the opinion that the plaintiff has proved that the four-county area is the "section of the country."

### The Clayton Act.

With this arguendo assumption (i. e. that plaintiff has established the four-county area as the relevant geographic market), the issue arising under the Clayton Act can now be stated: Whether the proposed merger of PNB and Girard may substantially lessen competition or tend to create a monopoly in commercial banking in the four-county area, in violation of Section 7 of the Clayton Act.

The plaintiff contends that the proposed merger is in violation of Section 7 because of the following reasons: (1) the undeviating trend toward banking concentration in the four-county area; (2) the direct, substantial competition which will be eliminated; (3) the unlikelihood of substantial new entrants into the business; and (4) the much larger resources the merged bank would have.

Plaintiff places considerable weight on the second reason above listed. Cited is the often quoted section of the House Report which reads in relevant part:

"The bill is intended to permit intervention in such a cumulative process when the effect of an acquisition may be a significant reduction in the vigor of competition, even though this effect may not be so far-reaching as to amount to a combination in restraint of trade, create a monopoly, or constitute an attempt to monopolize. Such an effect may arise in various ways: such as elimination in whole or in material part of the competitive activity of an enterprise which has

been a substantial factor in competition, * * * " H. R. Rep. No. 1191, 81st Cong. 1st Sess. (1949), p. 8.

It is the plaintiff's position that the elimination of Girard, which defendants readily admit is in direct competition with PNB, will substantially suppress and lessen competition with the consequent tendency to monopoly.

Defendants, on the other hand, submit that the legislative history of the 1950 amendment to Section 7 of the Clayton Act discloses clearly that Congress did not intend that a merger or acquisition would be unlawful merely by reason of the elimination of competition between two business enterprises. It is argued that the basic test is whether, after considering all of the relevant factors, there is a reasonable probability of a significant reduction in the vigor of competition.

It is the opinion of this Court that the defendants have correctly stated the proper test. As mentioned previously, the key factor in all the antitrust laws is the preservation of vigorous competition. Unfortunately, Congress has not spelled out any definite formula for judging the legality of a merger under Section 7. Consequently, several different tests have been used or suggested, many of which have been subjected to severe criticism. However, the most practical one, from this Court's point of view, is that recognized in American Crystal Sugar Co. v. Cuban-American Sugar Co., 2 Cir., 259 F.2d 524, 527 (1958):

"And the ban on a substantial lessening of competition 'in any line of commerce in any section of the country,' requires, for determination of a violation, first, a definition of a relevant market in which a lessening of competition has probably occurred and, second, analysis of the nature and extent of the competition within that market. Consequently, the parties are agreed that an acquisition is not illegal because of its impact on competition between the corporations involved: that the proper test is one of the *qualitative* substantiality of the resulting effect on competition in the relevant market. We too agree. We hold that only an acquisition which in the long run may reasonably be expected to substantially lessen competition within a relevant market, will violate Section 7 as amended." (Emphasis supplied.)

The "qualitative substantiality" test, in contradistinction to "quantitative substantiality", requires an appraisal of all the relevant factors, not merely a determination of the aggregate share of the market which would be held by the merged banks. A qualitative analysis is the only procedure which this Court feels justified to follow. This type of an approach, however, is not without difficulty. Involved is a selection of those factors which can be considered relevant.

The Court will discuss and answer the following relevant questions: (1) How much of an increase in concentration will be brought about by the merger? (2) Will the increase in concentration give the merged bank the power to control the price and supply of banking services? (3) Will the merger eliminate a substantial competitor from the market? (4) What is the competitive situation among commercial banks in the relevant market today? (5) What will probably be the competitive situation after the merger? (6) What is the probability of a new commercial bank coming into existence in the four-county area? (7) What is the history of defendants with respect to prior mergers?

The Court is not unmindful of the fact that the relevancy of many of these factors has been challenged more than once. Nevertheless, the Court believes that the answers to these questions, considered collectively, rather than individually, will be valuable in predicting the vigor of competition in the relevant market after the merger. Perhaps other questions might also be posed. The Court, however, thinks that those presented are sufficient to give the correct answer. It should be

noted that in this discussion, the Court will not advert to the benefits of the proposed merger. The Court is convinced that the merger will definitely benefit the community, but does not consider this particularly relevant in the present discussion of the question posed. The questions and discussions thereon follow:

(1) Increase in Concentration: As of December 31, 1960, there were 41 commercial banks with head offices in the four-county area, operating 284 commercial banking offices throughout Philadelphia, Bucks, Montgomery and Delaware counties. The largest bank, as of June 30, 1960, had total assets equal to 22.9% of the assets of all commercial banks with head offices in the four-county area. PNB ranked second with 21% and Girard, third with 16.1%. After the merger, the defendants would have approximately 37.1% of all the assets of all commercial banks within the four-county area.

PNB, as of October 3, 1960, had total net loans equal to 19.8% of the total loans made by all commercial banks with head offices in the four-county area. Girard had 14.6% of the total. The remaining three largest commercial banks in the four-county area, as of the same date, had 23.8%, 10.2%, and 9.1% respectively, of total net loans of all commercial banks with head offices in the four-county area. The combined bank would hold approximately 34% of all the loans of all commercial banks with head offices in the four-county area.

PNB, as of October 3, 1960, had total deposits equal to 21.3% of the total deposits of all commercial banks with head offices in the four-county area. Girard had 14.5% of the total. The other three largest commercial banks, as of the same date, had total deposits representing 22.1%, 9.9% and 9.3%, respectively, of toal deposits of all commercial banks with head offices in the four-county area. The combined bank would hold approximately 36% of all the deposits of all commercial banks with head offices in the four-county area.

The defendants rebut this increase in concentration charge with some figures of their own. Although the Court does not consider concentration in other cities decisive in this case, some of the percentage figures are nevertheless worthy of mention and consideration. If the 53 reserve and central reserve cities of the Federal Reserve System are ranked in the order of the percentage of total commercial banking assets in each city held by the largest commercial bank in that city as of June 1956, Philadelphia would, after the proposed merger, rank 32nd with 36.16%. Of the 224 cities in the United States with populations over 500,000 in 1956, 190 had a commercial bank with 35% or more of the total commercial banking assets in the city. There are four commercial banks in the United States, each with a lending limit greater than the aggregate of the lending limits of all the commercial banks in Philadelphia. Each of 20 commercial banks in the United States has a lending limit greater than that of any commercial bank in Philadelphia, and 9 of these are in cities smaller than Philadelphia. 13 such banks, 4 of which are in cities smaller than Philadelphia, have a lending limit greater than that of the proposed merged bank. The Court finds that no dangerously potential concentration will result from this merger.

(2) Power to Control Price and Supply of Banking Services: The plaintiff has not pressed this point in its post-trial brief. However, Dr. Oscar Goodman, Professor of Finance at the Graduate School of Business of Northwestern University, testified for the plaintiff that the merged bank would have the power to affect the price and supply of available bank credit within the four-county area. The Court is satisfied, however, that defendants have proved this to be impossible. Entirely too much competition exists at all levels to permit such an occurrence. The merged bank would lose a substantial amount of business in a brief period of time if it attempted to dictate the price and/or control the supply

of credit in the four-county area. The increase in size would not be sufficient for market domination. Because there are so many alternative choices for borrowers of all sizes, the merged bank would be unable to cause its competitors to raise service charges or interest rates, or prevent any borrower from having his banking needs met by other commercial banks.

(3) Elimination of a Substantial Competitor: Defendants do not (indeed they cannot) deny that substantial direct competition will be eliminated by the merger. PNB and Girard compete in the offering of banking services as well as in the acquisition of branch sites in the contiguous three counties. A substantial part of the transcript of testimony is directed to this area. However, the figures previously set out speak for themselves. Nothing would be gained in reciting the additional facts with respect to this phase of the case. Suffice it to state that the plaintiff has established that PNB and Girard do engage in substantial direct competition one with the other, but the Court, as discussed more fully infra, finds that the elimination of one competitor will not result in a lessening of vigorous competition in the commercial banking field.

(4 and 5) Competition: It is fair to say that competition among commercial banks in the four-county area is extremely vigorous. The plaintiff has not suggested otherwise; but, notwithstanding the established fact that Girard, a substantial competitor of all commercial banks in the four-county area, would be eliminated by the merger, the defendants contend that competition in the four-county area would be intensified *after the merger*.

Defendants produced several witnesses, including many representatives of other Philadelphia commercial banks, who testified that competition, after the merger, would be increased rather than lessened. For example, W. Carlton Harris, Emeritus Professor of Finance at the University of Pennsylvania and a director of the Broad Street Trust Company, testified that the merger would sharpen and probably increase competition among Philadelphia banks. He stated that this was the effect of previous mergers in the area. Samuel Weinrott, Chairman of the Board of Industrial Valley Bank and Trust Company, asserted that banking competition in Philadelphia today is greater than it was ten years ago. It was his opinion that competition would be increased by the merger. Mr. Weinrott stated, as did many of the other bankers, that he expected to acquire new business from defendants' customers who might have accounts with both PNB and Girard, or who might not approve of the merger for one reason or another. He also testified that smaller banks can and do compete actively with larger banks, and that previous mergers have not hindered the growth of the smaller banks. This opinion was substantiated by the exhibits produced, charting the rate of growth of the small commercial banks. Albert T. Mason, President of Liberty Real Estate Bank and Trust Company, Hubert J. Horan, Chairman of the Board of Broad Street Trust Company, and S. Harry Galfand, Chairman of the Board of Citizens and Southern Bank, all repeated in substance the testimony of Mr. Weinrott.

Lewellyn A. Jennings, Senior Vice-President of the Republic National Bank of Dallas, and former Acting Comptroller of the Currency, testified that competition among commercial banks was never keener and that all commercial banks are after mass banking business, competing for small and medium size loans. It was also his opinion that the merger will increase existing and potential competition in commercial banking in the Philadelphia area.

Dr. Warren Smith, Professor of Economics at the University of Michigan, however, testified that the elimination of a large lender will significantly reduce the degree of competition because an important alternative source of credit for many borrowers, over a rather wide area, will be eliminated. Indeed, this is the crux of the plaintiff's case. He, Professor

Smith, without any banking experience, stands alone in this forecast which the Court does not accept.

It is true that one alternative source of credit will be eliminated. It should be noted, however, that borrowers would have available the following alternatives after the merger: 41 commercial banks for loans up to $10,000; 39 for loans up to $25,000; 35 for loans up to $50,000; 27 for loans up to $100,000; 18 for loans up to $250,000; 10 for loans up to $500,-000; 7 for loans up to $1,000,000; 4 for loans up to $2,500,000; 3 for loans up to $5,000,000; 2 for loans up to $7,-000,000; and 1, as a result of the merger, for a loan up to $15,000,000. If these alternative sources intend to compete more vigorously than before, thereby increasing rather than decreasing the competitive pressure, Dr. Smith's conclusion that the merger will significantly reduce the degree of competition does not necessarily follow. Moreover, the main bone of contention here is that the merger will have its most serious effects on small and medium size borrowers. The above figures, however, indicate to the Court that there are more than an adequate number of sources for these types of borrowers. In fact, it has been established that a borrower turned down by three banks would be unable, with few exceptions, to obtain a loan at another commercial bank. And, of course, those borrowers in need of larger loans are not limited to the few banks in Philadelphia capable of making such a loan.

It is the conclusion of this Court that all indications are that competition will be even more vigorous after the merger than before.

(6) Probability of New Entrant: Plaintiff contends that it is very unlikely a substantial competitor will enter the market. Although the number of commercial banks in the four-county area has decreased from 108 in 1947 to 42 in 1960, it is nevertheless a fact that a commercial bank has been established in the last decade just outside Philadelphia, the Bank of Old York Road, which has experienced rapid and substantial growth.

It would be pure conjecture on the part of this Court, however, to predict that a substantial competitor will not likely enter the market in the future.

(7) Past Acquisitions: It has been established that a substantial part of the present size of both PNB and Girard has been achieved as the result of merger and consolidation in the last ten years. However, it has been shown that mergers with existing banks in the suburbs of Philadelphia were, in many cases, the only feasible way for larger banks to follow the migration of many of their customers into these areas. In addition, in many cases, it appears that small banks in the four-county area have found mergers with larger banks to be a solution to their problems of inadequate banking services, rising costs, and management succession.

In summary, it can be said that although the merger will increase concentration to the percentage figures given, the merged bank would have no power to control the price and supply of credit, nor could it dominate the market in any manner. And, although a direct substantial competitor will be eliminated, the only competent testimony upon the subject establishes that competition will be more vigorous after the merger. Also, although the commercial banking field is not an easy one to enter, it cannot be concluded that a new bank will not be established in the four-county area in the future. Finally, although the defendants have engaged in prior mergers, these mergers have had valid business purposes as the motivating force.

Viewing all this collectively, the Court can see no reasonable probability that competition among commercial banks in the four-county area will be substantially lessened.

Moreover, it is difficult to perceive a reasonable probability that this merger will tend to create a monopoly in commercial banking in the four-county area. Certainly, every time one bank in an area is eliminated, the path toward an eventual monopoly or oligopoly is shortened. This can be said for the most insignificant

combination. But this does not mean that a monopoly is inevitable. Especially is this true in the area of bank mergers. Every future merger in the four-county area will be subject to the close scrutiny of the appropriate state and federal agency. At some point any trend, if discernible in the future, will be checked. Although some of plaintiff's witnesses, for the most part independent bankers from smaller communities throughout the country, were of the opinion that approval of this merger would trigger others in the four-county area, as well as the remainder of the United States, this Court is not prepared to concur. The competitive situation that exists in the four-county area, with the many alternatives available to a prospective customer, leads to the inescapable conclusion that any tendency to monopoly or oligopoly at this stage is nonexistent. What happens in the future must be left to the appropriate federal banking agency, and, if necessary, to another Court at another time. All that is being said is that this particular merger will not tend to create a monopoly.

#### The Sherman Act.

This Court has also been called upon to decide whether the combination of PNB and Girard will result in an unreasonable restraint of trade or commerce in commercial banking in the four-county area in violation of Section 1 of the Sherman Act. Of course, the same assumption with respect to the relevant geographic market applies here as it did when the Clayton Act was considered.

■■■ Very briefly it can be stated that a merger which does not violate the Clayton Act can hardly be held to violate the more stringent standards of the Sherman Act.

■■■ Even aside from any consideration of the Clayton Act, however, the plaintiff has failed to establish by a fair preponderance of the evidence that the proposed merger constitutes an unreasonable restraint of trade or commerce. To warrant an injunction restraining an alleged violation of Section 1, there must be a definite factual showing of illegality.

Standard Oil Co. (Indiana) v. United States, 283 U.S. 163, 179, 51 S.Ct. 421, 75 L.Ed. 926 (1931).

In United States v. Columbia Steel Co., 334 U.S. 495, 527–528, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948), the Supreme Court laid down some guidelines to be considered when an acquisition of assets is being challenged under the proscriptions of the Sherman Act:

"It is first necessary to delimit the market in which the concerns compete and then determine the extent to which the concerns are in competition in that market. If such acquisition results in or is aimed at unreasonable restraint, then the purchase is forbidden by the Sherman Act. In determining what constitutes unreasonable restraint, we do not think the dollar volume is in itself of compelling significance; we look rather to the percentage of business controlled, the strength of the remaining competition, whether the action springs from business requirements or purpose to monopolize, the probable development of the industry, consumer demands, and other characteristics of the market. We do not undertake to prescribe any set of percentage figures by which to measure the reasonableness of a corporation's enlargement of its activities by the purchase of the assets of a competitor. The relative effect of percentage command of a market varies with the setting in which that factor is placed."

The Court does not intend to repeat the facts considered when discussing the alleged violation of the Clayton Act. Suffice it to state that a re-evaluation of them, in light of what has been said above, convinces the Court that the proposed merger meets the "reasonable" test and does not violate Section 1 of the Sherman Act.

#### FINDINGS OF FACT AND CONCLUSIONS OF LAW.

The Government has submitted 600 proposed Findings of Fact and numerous

proposed Conclusions of Law. The Court has reviewed these in great detail. Many of them have to do with separate lines of commerce which clearly are not applicable since the Court has found that the line of commerce is commercial banking in all its integral parts. An inordinate number refer to the four-county area which the Court has determined not to be the relevant market. Many have no bearing on the decision of the action.

The Court, therefore, makes the following rulings on the Government's proposed Findings of Fact:

Nos. 1 to 8 incl. affirmed; 9 and 10 refused as stated; 11, 12, 13 affirmed; 14 refused as stated; 15, 16, 18 affirmed; 19 refused as stated; 20 to 23 incl. affirmed; 24, 25 refused as stated; 26, 27, 28 affirmed; 29, 30, 31 refused as stated; 32 affirmed; 34 refused as stated; 35 affirmed; 36 refused as stated; 37 affirmed; 38 refused as stated; 39, 40 affirmed; 41 refused as stated; 42 affirmed; 43 refused as stated; 44 to 47 incl. affirmed; 48 refused as stated; 49 affirmed; 51, 52, 53 refused as stated; 54 to 68 incl. affirmed; 69 refused as stated; 70 affirmed; 71 refused as stated; 72, 73, 74, affirmed; 75 refused as stated; 76 to 82 incl. affirmed; 83 refused as stated; 84, 85 affirmed; 86, 87 refused as stated; 88, 89, 90 affirmed; 91 to 157 incl. refused as stated as not pertinent to the decision of this case; 158 to 231A refused as stated, since these requests are designed to establish separate lines of commerce, and the Court has determined commercial banking, in all its relevant integral parts, is the line of commerce involved; 232 to 285 incl., the statistical tables are approved; the conclusions therefrom which the plaintiff asked the Court to draw are denied, and the remaining parts are refused as stated; 286 to 290 incl. affirmed; 291 refused as stated; 292 to 297 incl. affirmed; 298 refused as stated; 299 to 318 incl. affirmed; 319 refused as stated; 320 to 325 affirmed; 326 refused as stated; 327, 328 affirmed; 329, 330, 331 refused as stated; 332 affirmed; 333 to 335 incl. refused as stated; 336 to 345 affirmed; 346 refused as stated; 347, 348, 349 affirmed; 350 refused as stated; 351 affirmed; 352 refused as stated; 353 affirmed; 354 refused as stated; 355, 356 affirmed; 357 refused as stated; 358 affirmed; 359 refused as stated; 360 affirmed; 361, 362 refused as stated; 363 to 384 incl. affirmed; 385, 386 refused as stated; 387, 388, 389 affirmed; 390, 391 denied; 392, 393, 394 affirmed; 395, 396 refused as stated; 397 to 401 incl. denied; 402 to 431 incl. refused since they presuppose a four-county relevant market which the Court has found to be nonexistent; 432 to 458 affirmed; 459 refused as stated; 460, 461 affirmed; 462 denied; 463 to 471 affirmed; 472, 473 refused as stated; 474 affirmed; 475 to 600 incl. refused as stated; these requests are argumentative, do not completely reflect the situations developed by the testimony, and do not reflect the findings of the Court as set forth in the Opinion.

The Conclusions of Law submitted by the plaintiff are refused as stated.

The affirmation of plaintiff's proposed Findings is subject to the Findings of the Court as to the facts of the case set forth in the Opinion, and in the event of any possible conflict between the proposed Findings of Fact and statements made in the Opinion, the language of the Opinion shall govern.

Of the defendants' requested Findings of Fact, Requests Nos. 54, 55, 58 to 92, and Request No. 162 are refused as stated and the remainder Requests are affirmed.

In the event of any possible conflict between defendants' requested Findings of Fact and statements made in the Opinion, the language of the Opinion shall govern.

All Conclusions of Law requested by the defendants are refused as stated.

## RESUMÉ.

As before stated, this is the first action tried after the passage of the Bank Merger Act of 1960. The controversy inherent in the case between co-ordinate

branches of the Executive Department of Government is to be regretted. Congress, in passing the Bank Merger Act, deliberately fixed the responsibility of approving or disapproving proposed mergers of national banks in the Comptroller of the Currency. This responsibility was fixed despite vigorous protests of individual bankers and the Department of Justice. The Comptroller of the Currency then, by Act of Congress, was of necessity required to consider the reports of the Federal Reserve Board, the Federal Deposit Insurance Corporation, and the Attorney General, with respect to the competitive factors involved. All three of these Departments of Government reported that in the opinion of their experts, the consummation of the proposed merger would adversely affect competition in the Philadelphia area. The Federal Deposit Insurance Corporation concluded that the merger would not be adverse in the regional, national and international field of competition. With these reports available to him, and after considering them, the Comptroller, in pursuance of his statutory duty, reviewed them and despite their content, approved the merger as not involving undue concentration of banking power, not tending toward a monopoly, not destructive of competition in the commercial banking field, and definitely in the public interest. The Court, after a full trial, agrees completely with the conclusions of the Comptroller of the Currency.

This is one of the few instances in which one Department of the Government, after having been consulted and its advice not being followed, has challenged in the Court the findings of a co-ordinate Department of the Executive Branch of the Government on the basis of disagreements between Departments of our Government. And what is the expertise of these three dissenting co-ordinate branches of the Executive Department that prompted this challenge? The Courts have uniformly held that once Congress has reposed its confidence in the expertise of a particular Department, the Courts should not substitute its judgment in the place and stead of the Department involved. The Government has asked this Court, without the production of a single shred of evidence, and on the basis of reports no more illuminating than that of the Comptroller of the Currency, to give legal effect to the conclusions of the dissidents, rather than the Department charged with the responsibility.

This Court fails to see how any court, without some factual basis being laid therefor, could accede to any such request and this is all the more true in this particular case where experienced, substantial bankers throughout this entire area have appeared in open court, subjected themselves to searching cross-examination, and have unanimously demonstrated that the proposed merger would not cause an undue concentration of banking, would not tend toward a monopoly, and definitely would increase the vigor of competition which the Congress of the United States from the passage of the Sherman Act down to the present date has, by law, attempted to foster.

The Court was not impressed with the attempts of the Government to show that banking is of minor importance in the life of a community generally and of almost absolute unimportance in the business life of the community. The Government, in its attempt to establish this contention by testimony that no single particular individual industrial organization had ever entered a particular territoy because of the presence or absence of banking facilities, has ignored the industrial history of the United States. Should one ever speculate as to whether any industry would enter a community without banking facilities, the answer would be completely obvious. Historically, banking facilities have preceded industry in every community.

The Government also attempted to show that by combining the lending limits of all Philadelphia banks, borrowers in the larger categories could be well accommodated. This ignores again the realities of the situation and the

positive testimony that in the larger industries, there is a decided reluctance on the part of financial officers to be made the subject of participating loans. With the originating bank, there is also an aversion to these loans as it requires considerable negotiation and technical handling which is to be avoided wherever possible.

The evidence demonstrated beyond peradventure of doubt that the Philadelphia area, plus parts of Delaware and New Jersey, and also New York City, as well as most of the northeastern part of the United States, is the area of active competition for Philadelphia commercial banks and for the proposed merged bank. The testimony discloses that the competitive effect upon all Philadelphia commercial banks will be minimal. The larger bank, however, will be able to compete on better terms and in a better atmosphere with the banks of other cities and states that have been draining this area of banking business which might well be and perhaps properly should be handled here, and which cannot be handled under present circumstances. That it will benefit the city and area has been established clearly by a fair preponderance of the evidence, as has been set forth in the Findings of Fact of the defendants previously affirmed.

There is nothing in this record which supports the averments of the complaint that the proposed merger involves an unlawful combination in restraint of trade; would result in or tend toward monopoly, or violate the provisions of the Clayton Act, if applicable; and the proposed merger certainly violates no provision, either express or implied, contained in the Bank Merger Act of 1960.

Since the proposed merger contains none of the defects alleged in the Government's case and will be in the public interest, it follows that judgment must be entered in favor of the defendants and against the plaintiff.

## CONCLUSIONS OF LAW.

1. The Court has jurisdiction of the parties and of the subject matter.

2. The Bank Merger Act of 1960 does not, by its terms, remove bank mergers from the application of either the Sherman Antitrust Act or the Clayton Act.

3. The approval of the merger by the Comptroller of the Currency, under the Bank Merger Act, is not the final and exclusive determination of its legality.

4. The proposed merger of the Philadelphia National Bank and the Girard Trust Corn Exchange Bank is not within the scope of Section 7 of the Clayton Act.

5. Plaintiff has failed to prove that the merger would violate Section 7 of the Clayton Act, even assuming the same to be applicable, because the preponderance of credible evidence shows:

(a) That the four-county area is not the relevant geographic market (see plaintiff's requests 5, 6, and 372);

(b) Even assuming that the four-county area is the relevant geographic market, credible evidence shows that the proposed merger will not substantially lessen competition or tend to create a monopoly in commercial banking in the four-county area.

6. The plaintiff has failed to prove by a fair preponderance of credible evidence that the merger will unreasonably restrain trade and commerce in commercial banking either in the relevant geographic market or in the four-county area.

7. Defendants are entitled to judgment dismissing the complaint in its entirety on the merits.

An order dismissing the action with prejudice will be filed concurrently with this opinion.